757 A.2d 266

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. RICHARD FEASTER, DEFENDANT–APPELLANT.

Argued March 27, 2000—Decided August 2, 2000.

*Abby P. Schwartz,* Assistant Deputy Public Defender, and *Claudia Van Wyk,* Deputy Public Defender II, argued the cause for appellant (*Ivelisse Torres,* Public Defender, attorney).

*Debra A. Owens,* Deputy Attorney General, argued the cause for respondent (*John J. Farmer, Jr.,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

STEIN, J.

On March 15, 1996, defendant Richard Feaster was convicted by a Gloucester County jury of the purposeful-or-knowing murder by his own conduct and the felony-murder of Keith Donaghy. The jury also convicted him on related charges of conspiracy to commit murder, first-degree robbery, conspiracy to commit armed robbery, possession of a weapon for an unlawful purpose and possession of a sawed-off shotgun. On the capital murder conviction, defendant was sentenced to death. On the non-capital convictions, defendant's conspiracy convictions merged into the related substantive offenses and the felony-murder conviction was merged into the conviction for purposeful-or-knowing murder. Defendant's conviction for possession of a weapon for an unlawful purpose was merged into the robbery-murder convictions. The court sentenced defendant to a consecutive twenty-year term of imprisonment with ten years of parole ineligibility for the robbery conviction and a five-year term of imprisonment for the conviction of possession of a sawed-off shotgun, to be served concurrently.

This Court affirmed defendant's conviction for capital murder and his death sentence. *State v. Feaster,* 156 *N.J.* 1, 93, 716 *A.*2d

395 (1998). We also affirmed his convictions and sentences on the other charges. *Ibid.*

Defendant requested proportionality review for his death sentence pursuant to *N.J.S.A.* 2C:11-3e. *Feaster, supra,* 156 *N.J.* at 93, 716 *A.*2d 395. We granted that request and now find no disproportionality in defendant's sentence of death.

I

Facts

The facts of this case are detailed in *Feaster, supra,* 156 *N.J.* at 18-33, 716 *A.*2d 395, and we draw from that opinion those facts that are material to this proportionality review.

Several weeks before the October 6, 1993 murder of Keith Donaghy, defendant began asking his friend Daniel Kaighn if he could borrow a handgun, purportedly to collect money that his employer owed to him. Two weeks before the murder, Kaighn complied and, in return for a payment of $100 for one day's use, gave him a sawed-off twenty-gauge shotgun and ammunition. That same night, defendant returned the gun to Kaighn along with all the ammunition he had been given earlier in the day. He gave Kaighn $30, saying that his employer had failed to pay the full amount owed to him. Subsequently, the gun was stored in the back of the car of Tina Shiplee, a friend of defendant and of Kaighn.

On the night of the murder, defendant and a friend, Michael Mills, were at the Columbia Café, a bar, playing pool and drinking with some friends, including Tina Shiplee. At that time, the gun was still in the back of Shiplee's car in a blue gym bag. Shiplee approached defendant and requested that he remove the gym bag before leaving that night. Defendant agreed to remove it. Shiplee's unlocked car was in the parking lot of the Columbia Café. When Shiplee left the Columbia Café later that night, she noticed that the blue gym bag had been removed from her car. She was unsure whether it was Mills or defendant who eventually took the

bag from the car. At around 8:00 p.m., defendant and Mills borrowed a car and left the bar for about one hour. *Feaster, supra,* 156 *N.J.* at 21, 716 *A.*2d 395.

That night, Keith Donaghy was the only attendant working at the Family Texaco in Deptford Township. Sometime between 8:20 and 8:25 p.m., his body was discovered lying on the floor of the station office. *Ibid.* $191.32 had been taken from one of his pockets. *Id.* at 24, 716 *A.*2d 395.

When defendant returned to the Columbia Café that evening, at approximately 9:00 p.m., he appeared to have been using drugs, as he had white powder around his nose. Before leaving the bar that evening, Shiplee overheard defendant say to Mills and Michael Sadlowski, another acquaintance, that he could not "believe he killed the guy and didn't get any money." *Id.* at 22, 716 *A.*2d 395. At trial, Sadlowski denied that defendant had made that statement to him.

Later that same night, defendant was at a friend's house watching the eleven o'clock news. After a segment describing the murder of Keith Donaghy had aired, Sadlowski observed that "defendant had become sweaty and 'fidgety,' and that he stated, 'I can't believe I did this shit. I can't believe this. Why me? You know.'" After the news broadcast ended, defendant again told Sadlowski, "I can't believe I did this shit." *Ibid.*

When he was going home, defendant said to Sadlowski that he "blew the dude's head off," and that he "screwed up tonight." *Id.* at 23, 716 *A.*2d 395. Defendant also said, "I can't believe I did this." *Ibid.* During their drive home, "defendant tearfully explained that 'his brains went all over the place' and repeated that 'I can't believe I did this shit.'" *Ibid.* Sadlowski then dropped defendant off. *Ibid.*

Initially, the investigation into the murder of Keith Donaghy met with little success. On October 31, 1993, however, another gas station attendant, Ronald Pine, was murdered. Defendant's friend, Tina Shiplee, suspected that defendant had committed the

murder and, fearing that he might kill again, contacted a lawyer who contacted the police. Shiplee then gave a statement implicating defendant in both murders. Subsequently, defendant was charged with both murders but the indictments were later severed and no mention of the second murder was permitted at defendant's trial for the murder of Keith Donaghy. *Id.* at 24, 716 *A.*2d 395. On April 1, 1996, defendant pled guilty to the knowing-and-purposeful murder of Ronald Pine.

Keith Donaghy died from a single shotgun wound to the head. There was no evidence indicating that a struggle had occurred. *Id.* at 23, 716 *A.*2d 395. Only one of Donaghy's pockets was in plain view as he lay dead on the ground, and money remained in Donaghy's other pockets that were not exposed. *Id.* at 24, 716 *A.*2d 395. That evidence led the State to believe that defendant did not take the money until after Donaghy was dead and supported the State's argument that defendant intended to kill and to rob the station attendant even before he reached the gas station. *Ibid.*

At trial, Kevin Wrigley testified that he shared a holding cell with defendant for a brief period while defendant was awaiting trial. *Id.* at 26, 716 *A.*2d 395. Wrigley stated that among other statements made by defendant, he heard defendant "describe how he shot someone in the head at point-blank range in order to 'see what it felt like' to kill someone before he entered the Marines." *Ibid.* Wrigley also said that he heard defendant say that he stole "a couple hundred dollars" from the scene of the murder and that he, defendant, threw the murder weapon away. *Id.* at 27, 716 *A.*2d 395.

Other State witnesses included members of the circle of friends with whom defendant previously had socialized. They testified about the various statements concerning the murder that defendant had made. No physical evidence directly linked defendant to Donaghy's murder. *Ibid.*

Defendant did not testify at trial. The defense strategy was to challenge the credibility of the State's witnesses and to raise the

possibility that Michael Mills was the triggerman. Mills had met with police before trial and made a statement, but because he committed suicide in June, 1994, his statement was not admitted at trial. The defense highlighted various witnesses' use of drugs and alcohol, the consideration given by the State for their testimony, and the discrepancies in the statements they made to authorities. *Id.* at 27–29, 716 *A.*2d 395.

During closing arguments, defense counsel emphasized the lack of physical and direct evidence in the case and attacked the credibility of the State's witnesses. Defense counsel also suggested that Mills, not defendant, had committed the murder. *Id.* at 29, 716 *A.*2d 395.

The prosecutor stressed the evidence that indicated premeditation and intent on the part of defendant. *Id.* at 30, 716 *A.*2d 395. He characterized Mills as the "getaway driver" and emphasized that defendant, not Mills, was the triggerman. *Ibid.*

On March 15, 1996, the jury found defendant guilty of all crimes charged. *Ibid.*

At the ensuing penalty phase, the sole aggravating factor alleged by the State was that the murder occurred while defendant was engaged in the commission of a robbery. See *N.J.S.A.* 2C:11–3c(4)(g). Defendant relied on ten mitigating factors:

1. Defendant never had been convicted of a crime and had never been incarcerated previously.

2. Defendant was twenty-two and not fully matured at the time of the crime.

3. Defendant suffered one or more head traumas resulting in an organic brain condition that affected his judgment and impulse control to the [extent] that normal people are not affected.

4. Defendant's ability to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease and/or defects and emotional disturbances and intoxication.

5. Defendant was raised in a household with one alcoholic parent, which predisposed him to substance abuse and delinquent behavior, undermining the controls normally present in others.

6. Defendant was raised in a home with an emotionally and physically abusive father, substantially affecting his maturation and development, with the effect,

among others, of predisposing him to delinquent and violent behavior to the extent normal adults are not so predisposed.

7. Defendant had an excellent work record while living in Florida, away from the turmoil of his family, which was interrupted only by a work-related injury.

8. Defendant was a successful athlete during adolescence and high school, responding well to coaching and discipline.

9. Defendant's success under coaching and sports and in working in an environment away from the turmoil of his family demonstrated that he could be rehabilitated in a regimented environment such as prison.

10. Any other factor that the jurors, or any one of them, may deem relevant to defendant's character or record or to the circumstances of the offense.
    [*Id.* at 31–32, 716 *A.2d* 395.]

Several experts testified about defendant's mental health. A neurologist described abnormally excessive electrical activity in the left frontal lobe of defendant's brain and testified that people with that abnormality tend to be impulsive and have memory problems. Similarly, a clinical neuropsychologist testified that injuries to the left frontal lobe affect one's ability to control impulses and diagnosed defendant as suffering from encephalopathy, or brain injury, as a likely result of a series of concussions. *Id.* at 32, 716 *A.2d* 395. Defendant's alleged head injuries were caused by a fall from a pickup truck, an injury sustained when defendant's head hit a tree, and repeated impacts that occurred during his football career. *Ibid.* A psychiatrist also testified that defendant's ability to control impulses was compromised by encephalopathy, but that he could be helped through psychotherapy and counseling. *Ibid.* Defendant was described as having borderline intelligence. A psychologist also testified that the alcoholic and abusive household in which defendant was raised was a traumatic environment, but expressed the view that therapy could help defendant. *Ibid.*

A social worker described the Feaster home, in which Mrs. Feaster and defendant were abused, as one "in denial." *Ibid.* Defendant's mother also testified that defendant's father was an alcoholic who verbally abused her and defendant and that, as defendant grew older, there were frequent physical altercations between him and his father. *Ibid.*

The jury found as an aggravating factor that defendant committed the murder while engaged in the commission of a robbery. Two jurors accepted the third mitigating factor, that defendant suffered from an organic brain disorder resulting from head traumas that impaired his judgment. *Ibid.* Five jurors accepted the mitigating factor that defendant's father was physically and emotionally abusive. *Ibid.* Three jurors found the ninth factor, that defendant's work record in Florida and his high school athletic experience demonstrated that he could be rehabilitated in prison. *Id.* at 32–33, 716 A.2d 395. The jury unanimously rejected the remaining mitigating factors. *Id.* at 33, 716 A.2d 395. The jury also concluded unanimously that the sole aggravating factor outweighed beyond a reasonable doubt any mitigating factor or factors, thus resulting in defendant's death sentence. *Ibid.*

As previously noted, this Court affirmed defendant's conviction and sentence. *Feaster, supra,* 156 *N.J.* at 93, 716 A.2d 395. We now conduct proportionality review of defendant's sentence of death.

## II

### Proportionality Review

In *State v. Loftin,* 157 *N.J.* 253, 266–77, 724 A.2d 129 (1999) (*Loftin II*), this Court summarized the history and purpose of proportionality review in the United States and in New Jersey. Subsequently, in *State v. Cooper,* 159 *N.J.* 55, 68–73, 731 A.2d 1000 (1999) (*Cooper II*), we reiterated our basic methodology when conducting proportionality review. There, we explained that it

> encompasses two distinct approaches: first, we use a frequency analysis that includes both mathematical and statistical calculations to compare defendant's case to other cases with similar fact patterns or similar levels of culpability in order to ascertain the rate of death sentencing in those similar cases; second, we engage in precedent-seeking review in which we compare all relevant factors in factually similar cases to determine whether defendant's death sentence appears to be disproportionate in comparison to the sentences imposed on other defendants who committed comparable homicides.

[*Id.* at 70, 731 A.2d 1000.]

Since we decided *Cooper II, supra*, we have reevaluated the elements of individual proportionality review. *In re Proportionality Review Project*, 161 *N.J.* 71, 735 *A.*2d 528 (1999) (*Proportionality Review I*). In *Proportionality Review I, supra*, we reviewed Special Master Judge David Baime's findings and recommendations. We held that the universe of cases for proportionality review should continue to include all defendants who were eligible for the death penalty, whether or not they were prosecuted capitally. *Id.* at 84–87, 735 *A.*2d 528. We also determined that a modified salient-factors test containing fewer subcategories should be adopted, *id.* at 87–89, 735 *A.*2d 528, and that the index-of-outcomes test should be abandoned. *Id.* at 91, 735 *A.*2d 528.

In its current formulation, frequency analysis thus consists solely of the salient-factors test. The salient-factors test measures the relative frequency of a defendant's sentence by determining the frequency at which factually similar cases result in a death sentence. *Cooper II, supra*, 159 *N.J.* at 70–71, 731 *A.*2d 1000. Through that test we seek to determine "whether there is a societal consensus that the defendant in the case before us is sufficiently culpable such that his sentence may be deemed not aberrational." *State v. Chew*, 159 *N.J.* 183, 201, 731 *A.*2d 1070 (1999) (*Chew II*). If the ratio of death sentences to penalty-trial cases or of death sentences to death-eligible cases is high, thereby demonstrating a substantial correlation between a defendant's most salient factor and death sentencing, then we may interpret the relatively high rate of death sentencing as "strong evidence of the reliability of [the] defendant's death sentence." *State v. Bey*, 137 *N.J.* 334, 358, 645 *A.*2d 685 (1994) (*Bey IV*).

A. *Universe of Cases*

Our first task is to establish the universe of cases to which defendant's case will be compared. In *Proportionality Review I, supra*, we held that the existing clearly death-eligible universe of cases for proportionality review should be retained. 161 *N.J.* at 84, 735 *A.*2d 528. As in our earlier proportionality review cases,

we continue to include in the category of death-sentenced cases those death-sentenced cases that were reversed on appeal because of procedural, burden-of-proof, or *Gerald*-type errors. See, *e.g., Cooper II, supra,* 159 *N.J.* at 74, 731 *A.*2d 1000. However, those cases that were not death-eligible but proceeded to a penalty-phase hearing are not included in the universe of cases. *Id.* at 75, 731 *A.*2d 1000.

As we explained in *Cooper II,* the salient-factors test "uses the AOC's database in which the universe of death-eligible cases is subdivided into categories and subcategories, ranked in descending order of blameworthiness, and derived from the statutory aggravating factors." *Id.* at 71, 731 *A.*2d 1000. Each defendant is assigned to one of the thirteen major categories. *Ibid.* Each category contains between two and seven subcategories "that aggravate or mitigate the blameworthiness of defendants included in the primary category." *Id.* at 71–72, 731 *A.*2d 1000. "In applying the salient-factors test, we compare defendant's death sentence to the sentences imposed in factually similar cases within the same primary category in order to ascertain the frequency with which death sentences generally are imposed in such cases." *Id.* at 72, 731 *A.*2d 1000. We use two sets of calculations of the rate of death sentencing, one that includes the defendant and another that excludes him or her. *Id.* at 75, 731 *A.*2d 1000.

Pursuant to our order that followed *Proportionality Review I, supra,* the AOC has divided category F, robbery-murder, into three subcategories because of the large number of cases in that category. 161 *N.J.* at 88, 735 *A.*2d 528. Here, the AOC has assigned defendant to cell F–2, which comprises murders committed in the course of the robbery of a business. We continue to "defer generally to the AOC's expertise, and particularly to its unique assignment of defendants to only one comparison category." *State v. DiFrisco,* 142 *N.J.* 148, 167, 662 *A.*2d 442 (1995) (*DiFrisco III* ). Neither the Attorney General nor the Public Defender objects to that assignment of defendant, nor do they

object to the inclusion or exclusion of any defendants in or from the subcategory.

### B. *Salient–Factors Test*

■ Of the thirty-three death-eligible cases in subcategory F–2, eighteen cases proceeded to the penalty phase, and five defendants, (Long, Hightower (2), Morton, and Feaster) were sentenced to death. One defendant, Jacinto Hightower, received a second sentence of death after his first death sentence was vacated. Defendant Robert Morton, whose death sentence we also affirm today, is included in the statistics below as one of the defendants in the F–2 subcategory who was sentenced to death. Accordingly, including defendant, the death-sentencing rate for all murders committed in the course of the robbery of a business that we include in the F–2 subcategory is 15.2% ($\frac{5}{33}$), and for those proceeding to a penalty phase the rate is 27.8% ($\frac{5}{18}$). Excluding defendant from the F–2 subcategory does not substantially or significantly alter the death-sentencing rates. The following table summarizes the results of the salient-factors test as applied to the F–2 subcategory:

SALIENT–FACTORS TEST: F–2 SUBCATEGORY
(data from *Feaster Report*, tbl. 7)

| | Death–Sentencing Rate At Penalty Trial | | Death–Sentencing Rate for All Eligible Cases | | Proportion of Cases Advancing to P–Trial | |
|---|---|---|---|---|---|---|
| *F–2  Incl. D* | 27.8% | ($\frac{5}{18}$) | 15.2% | ($\frac{5}{33}$) | 54.5% | ($\frac{18}{33}$) |
| *F–2  Excl. D* | 23.5% | ($\frac{4}{17}$) | 12.5% | ($\frac{4}{32}$) | 53.1% | ($\frac{17}{32}$) |
| *All Ds* | 29.5% | ($\frac{52}{176}$) | 11.4% | ($\frac{52}{455}$) | 38.7% | ($\frac{176}{455}$) |
| *All Ds but D* | 29.1% | ($\frac{51}{175}$) | 11.2% | ($\frac{51}{454}$) | 38.5% | ($\frac{175}{454}$) |

Applying the salient-factors test to the general "F" category results in a death-sentencing rate for penalty-trial cases (including defendant) of 29.3% ($\frac{12}{41}$), and the death-sentencing rate for all death-eligible cases is 8.4% ($\frac{12}{143}$). The following table summarizes the result of the salient-factors test as applied to category "F" death-penalty cases:

SALIENT–FACTORS TEST:  F CATEGORY
(data from *Feaster Report*, tbl. 7)

| | Death–Sentencing Rate At Penalty Trial | Death–Sentencing Rate for All Eligible Cases | Proportion of Cases Advancing to P–Trial |
|---|---|---|---|
| F    Incl. D | 29.3%  ($^{12}/_{41}$) | 08.4%  ($^{12}/_{143}$) | 28.7%  ($^{41}/_{143}$) |
| F    Excl. D | 27.5%  ($^{11}/_{40}$) | 07.7%  ($^{11}/_{142}$) | 28.2%  ($^{40}/_{142}$) |
| All Ds | 29.5%  ($^{52}/_{176}$) | 11.4%  ($^{52}/_{455}$) | 38.7%  ($^{176}/_{455}$) |
| All Ds but D | 29.1%  ($^{51}/_{175}$) | 11.2%  ($^{51}/_{454}$) | 38.5%  ($^{175}/_{454}$) |

The preceding tables demonstrate that for those defendants who commit murder while in the course of committing a robbery of a business, the percentage of death-eligible cases that proceeded to a penalty phase is higher than the overall average for death-eligible cases.  Thus, it is not aberrational for the death penalty to be sought in such a case.  Moreover, the tables indicate that five of eighteen defendants (including defendant), or four of seventeen defendants (excluding defendant), where the defendant has committed murder while in the course of committing a robbery of a business, is sentenced to death in those cases that proceed to a penalty trial.  The rate of death-sentencing for those defendants exceeds the death-sentencing rate in the full universe of death-eligible cases.  We conclude that application of the salient-factors test to defendant Feaster does not demonstrate that his death sentence is disproportionate.

## III

### Precedent–Seeking Review

We have observed previously that it is "appropriate to place greater reliance on precedent-seeking review than on frequency analysis" and have noted "that the process of precedent-seeking review is one familiar to us as judges and is not vulnerable to the concerns about reliability that burden frequency analysis." *Cooper II, supra,* 159 *N.J.* at 70, 731 *A.*2d 1000 (citations omitted). Our task in precedent-seeking review remains unchanged and requires us to "compare all relevant factors in factually similar cases to determine whether defendant's death sentence appears to be disproportionate in comparison to the sentences imposed on

other defendants who committed comparable homicides." *Ibid.* We seek "to ensure that the defendant has not been singled out unfairly for capital punishment" and we do that by engaging in a "traditional case-by-case review in which we compare similar death-eligible cases, considering the cases individually." *Id.* at 88, 731 *A.*2d 1000 (internal quotation marks and citations omitted).

A. *Analysis of Defendant's Culpability*

The cases against which we measure a specific defendant's case are chosen from the universe of cases that we use in our frequency review analysis. That ensures that the two analyses are complementary and may confirm each other. We choose the comparison cases based on relevant aggravating and mitigating factors, both statutory and non-statutory, that are "rooted in traditional sentencing guidelines." *State v. Marshall,* 130 *N.J.* 109, 159, 613 *A.*2d 1059 (1992) (*Marshall II* ). We recognize that a defendant's jury may have rejected an enumerated mitigating factor but nonetheless been influenced by the evidence presented in support of that mitigating factor. Therefore, we consider mitigating evidence "even though the jury found it insufficient to establish a statutory mitigating factor." *State v. Martini,* 139 *N.J.* 3, 54, 651 *A.*2d 949 (1994) (*Martini II* ). *See also Loftin II, supra,* 157 *N.J.* at 336, 724 *A.*2d 129; *DiFrisco III, supra,* 142 *N.J.* at 185, 662 *A.*2d 442; *Bey IV, supra,* 137 *N.J.* at 368, 645 *A.*2d 685. We consider "objective criteria derived from both statutory and nonstatutory aggravating and mitigating factors." *Loftin II, supra,* 157 *N.J.* at 336, 724 *A.*2d 129. The criteria must have been clearly submitted to the jury and likely to have influenced the jury's decision. *Bey IV, supra,* 137 *N.J.* at 368, 645 *A.*2d 685. We analyze those factors within a framework of culpability that consists of the defendant's moral blameworthiness, the degree of victimization and the defendant's character. *Martini II, supra,* 139 *N.J.* at 48–49, 651 *A.*2d 949. Here, we will consider cases in which the defendants committed deliberate murders in the course of a robbery of a business. Our task is to decide whether defendant's culpability, measured by objective

factors clearly present in the record that are relevant to blame-worthiness, victimization and character, "is more like that of defendants who received death sentences or of those who received life terms." *Id.* at 50, 651 *A.*2d 949.

### 1. Blameworthiness

For the purposes of examining defendant's moral blame-worthiness, "we examine such characteristics as motive, premedi-tation, justification or excuse, evidence of mental defect or distur-bance, knowledge of helplessness of the victim, defendant's age or maturity level, and defendant's involvement in planning the mur-der." *Loftin II, supra,* 157 *N.J.* at 336, 724 *A.*2d 129 (citation omitted). Consideration of those factors demonstrates that defen-dant has an average to high level of moral blameworthiness.

Defendant's motive for murdering Keith Donaghy was monetary gain. $191.32 was taken from Mr. Donaghy's pocket, apparently after he was shot. Monetary gain as a motive is common in the death-eligible universe of cases, constituting a motive in more than one third of those cases. Defendant's blameworthiness is height-ened, however, by the probability that he could have accomplished the robbery without committing murder.

Evidence of premeditation by defendant is sparse. Although defendant borrowed a weapon several weeks in advance of the killing, he returned that weapon the same day that he borrowed it. That Mills and defendant retrieved the gun from the trunk of the car on the night of the murder suggests that defendant may have decided to commit the murder while at the Columbia Café on the night of the murder. Thus, the premeditation, if any, was mini-mal.

There was some evidence that the murder may have been attributable in part to defendant's intoxication. He was drinking alcohol on the night in question and apparently also was using drugs. However, the effect of the alcohol and drugs on defendant is unknown and the jury unanimously rejected intoxication as a

mitigating factor. Nor was there any evidence of provocation, justification or excuse.

At the penalty phase of defendant's trial, he presented extensive evidence that he suffers from physical brain impairments as well as psychological impairments. Defendant's low intellectual capacity places him at approximately the bottom eight percent of the population, within the borderline mentally retarded or low-normal category. Despite evidence that defendant's childhood was dysfunctional and contributed to his personality disorders, the jury unanimously rejected mental disease or defect, or emotional disturbance, as a mitigating factor. Some jurors, however, found that defendant suffered one or more head traumas resulting in an organic brain condition, and that he was raised in a home with an emotionally and physically abusive father.

It is likely that defendant had knowledge of his victim's helplessness. Keith Donaghy was the only attendant on duty in the gas station on the night he was murdered. Other than defendant's co-defendant who committed suicide, there were no witnesses to the crime, which indicates that the area was deserted and that Mr. Donaghy was especially vulnerable to attack. It appears that defendant relied on the victim's solitude and vulnerability in planning the attack.

That defendant was twenty-two years old at the time of the homicide diminishes his blameworthiness to some extent. Defendant also presented evidence that his maturity level was significantly lower than his actual age because of childhood traumas and his low I.Q. The jury, however, did not find defendant's age or maturity level to be a mitigating factor.

Whether defendant was the sole planner of the murder is uncertain. Mills committed suicide before defendant's trial, and therefore was unable to testify about whether defendant was solely responsible for the crimes. Moreover, there is evidence to support a finding that Mills played a substantial role in the planning and commission of the robbery and murder.

In sum, the level of defendant's moral blameworthiness is average to high. There appears to have been little premeditation and defendant was young at the time of the murder. However, defendant exhibited complete callousness and lack of remorse toward his victim when he told a cellmate that he shot Donaghy "to see what if felt like" to kill someone. Moreover, defendant's knowledge of the victim's helplessness and vulnerability also is a factor that supports a finding of average to high moral blameworthiness.

## 2. Degree of Victimization

We evaluate the degree of victimization based on the relative violence and brutality of the murder and the injury to nondecedent victims. The extent of victimization in this case is average to low. Because there were no other people present while this murder took place, there were no injuries to nondecedent victims. Defendant killed Mr. Donaghy instantaneously by shooting him in his left cheek. The bullet passed through his brain and exited the back of his skull. Mr. Donaghy did not suffer a lingering death. There is no evidence that he was aware of defendant's presence or that he was in fear for his life. It appears that defendant shot Mr. Donaghy before he had a chance to realize what was happening and that his death was instantaneous. Thus, there is little indication that the victim suffered either emotionally or physically before his death. Moreover, no evidence was adduced concerning the effect of the offense on the victim's family.

## 3. Character of Defendant

■ Here, we consider defendant's prior criminal history, unrelated acts of violence, cooperation with authorities, remorse and capacity for rehabilitation. *Bey IV, supra,* 137 *N.J.* at 366, 645 *A.*2d 685. Defendant's prior record consists of three arrests and one unindictable conviction. His first arrest was for possession of marijuana and that charge is still outstanding. His second arrest was for simple assault, to which he pled guilty and was assessed a $100 fine. His last arrest was for possession of a controlled dangerous substance and drug paraphernalia. Those charges

were dismissed. Prior to this murder, defendant had engaged in no other unrelated acts of violence. There is no evidence of cooperation with authorities. Although defendant did not submit remorse as a mitigating factor, the record indicates that he exhibited disbelief, regret and emotion over what he had done. Nevertheless, defendant's callous comments to his cellmate about why he killed Donaghy at point blank range indicate a callousness that belies any remorsefulness. Concerning his potential for rehabilitation, defendant presented evidence that he could be rehabilitated in a structured environment such as prison, and three jurors found that potential to exist.

Overall, these facts lead us to conclude that defendant's culpability is substantial. Although the degree of victimization is low, his culpability and moral blameworthiness are average to high.

B. *Defendant's Comparison Group*

In precedent-seeking review we use the same comparison group that was used in the salient-factors test. *Chew II, supra,* 159 *N.J.* at 214, 731 *A.*2d 1070. We compare the facts of the comparison group cases to the facts of defendant's case and determine whether defendant's sentence is disproportionate in comparison with the culpability levels of the comparison group. We "identify in the comparison group all relevant aggravating and mitigating factors, both statutory and non-statutory, that are 'rooted in traditional sentencing guidelines.' " *Loftin II, supra,* 157 *N.J.* at 339, 724 *A.*2d 129 (quoting *DiFrisco III, supra,* 142 *N.J.* at 184–85, 662 *A.*2d 442).

As noted above, the AOC assigned defendant to subcategory F–2. The parties agree on thirteen cases that are factually similar to defendant's for purposes of precedent-seeking review. With the exception of Donald Loftin 1, who is assigned to cell F–3 (murder in the course of robbery of other than a home or business), all of those cases are within cell assignment F–2. Defendant proposes ten additional cases to which the State objects. With the exception of John Fauntenberry, who is assigned to cell B–1 (prior

murder conviction), all of those additional cases are also within cell assignment F–2. Defendant contends that all those cases have similarly-situated defendants because they all involve deliberate murders committed during planned robberies, in which the defendant's actions were certain to cause the death of the victim. To ensure that our precedent-seeking review is complementary to our salient-factors test results, we will include those cases proposed by defendant that are in the F–2 subcategory in performing the comparative-culpability analysis. In the interests of completeness, we will also consider the case of John Fauntenberry, who is assigned to cell B–1, and Donald Loftin 1, who is assigned to cell F–3.

As we acknowledged in *Cooper II, supra,* "the process of conducting precedent-seeking review is inherently subjective and does not lend itself to any analysis based on prescribed standards or factors." 159 *N.J.* at 92, 731 *A.*2d 1000. We noted that when we "compar[e] homicides from the standpoint of a defendant's blameworthiness or the extent of victimization, there obviously will be ample room for disagreement over which defendant was more culpable and which homicide was more violent and horrific." *Id.* at 92–93, 731 *A.*2d 1000. However, we believe that "[t]he virtue of precedent-seeking review is that it impels the Court to examine, evaluate, and compare homicides committed by defendants whose crimes were similar to the homicide committed by the defendant whose death sentence is under review, analyze the resulting sentences, and determine whether, in that unique context, the defendant's death sentence is aberrational." *Id.* at 93, 731 *A.*2d 1000. We also acknowledge "[t]he fallibility of [a] process . . . that . . . depends almost exclusively on imprecise, subjective reactions by the Court to the comparison cases." *Ibid.* Despite the flaws of the process, however, "we remain convinced that the process is an indispensable component of proportionality review and that, properly applied, it can assist the Court in identifying and isolating disproportionate sentences of death." *Ibid.*

## C. *F–2 Cases That Proceeded to Penalty Trial*

The Appendix to this opinion contains a description of the comparison cases. The descriptions of the cases are based on published opinions and on the discussion of cases found in the AOC's Detailed Narrative Summaries.

Of the twenty-one cases in the F–2 subcategory that are to be compared with defendant's case, twelve involved a penalty trial. Of those twelve cases, two resulted in death sentences: Jacinto Hightower and Robert Morton. Accordingly, no issue of disproportionality is presented by those defendants.

The life sentences imposed on capital defendants John Downie, Craig Hart, Roger Hoyte, David Mark Russo and Joseph Wilson readily can be reconciled with defendant's death sentence, in large part because of the mitigating evidence accepted by the jury that showed extreme mental or emotional disturbance on the part of the defendants, their youth or immaturity at the time of the crime, their diminished capacity at the time of the crime and that the defendants had no significant criminal history. We acknowledge that defendant Feaster's age when he committed the homicide was comparable to that of those defendants, but Feaster's jury did not find age to be a mitigating factor. Nor did the jury accept evidence that defendant suffered a mental disease or defect or emotional disturbance as mitigating factors.

(We note that in that connection our dissenting colleague relies on this Court's opinion in *Loftin II*, 157 *N.J.* at 340–41, 724 *A*.2d 129, in which the Court reconciled Feaster's life sentence after a guilty plea to the murder of a gas station attendant, committed subsequent to the subject homicide, on the basis of Feaster's head injuries, youth, and abusive childhood. *Infra* at 411–12, 414, 757 *A*.2d at 279, 281. Notwithstanding those observations in *Loftin II*, there can be no question that the primary basis for reconciliation of Loftin's death sentence with Feaster's life sentence for his second homicide is rooted in the fact that Feaster had previously been sentenced to death for the subject homicide.)

John Downie, a twenty-four-year-old defendant with no prior criminal history, robbed and then murdered a gas station attendant. He then shot at a police officer who witnessed him running from the gas station. Downie's upbringing was dysfunctional and chaotic and he had a long history of emotional disturbance. A psychologist testified at his trial that defendant's family members were schizophrenic. The jury found the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no significant criminal history) and c(5)(h) (catch-all) mitigating factors.

Craig Hart, a twenty-five-year-old defendant, robbed and murdered a taxi driver. Hart had no prior criminal record but had a history of cocaine and marijuana use. The jury found the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no significant criminal history) and c(5)(h) (catch-all) mitigating factors.

Roger Hoyte, a twenty-two-year-old defendant with a history of heroin, cocaine and marijuana abuse, shot and killed three taxi drivers. The jury found the c(5)(c)(age), c(5)(f) (no significant criminal history), c(5)(g) (cooperation with the state) and c(5)(h) (catch-all) mitigating factors.

David Mark Russo, a thirty-two year old defendant was intoxicated when he murdered a gas station employee and seriously injured two others. The jury found the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no significant criminal history) and c(5)(h) (catch-all) mitigating factors.

Joseph Wilson, a nineteen-year-old defendant with a history of marijuana and cocaine use, murdered an employee at a meat market. The jury found the c(5)(c)(age), c(5)(d) (diminished capacity) and c(5)(h) (catch-all) mitigating factors.

To reconcile defendant's death sentence with the life sentences imposed on Larry Jones, Rafael Slaughter, Aaron Stamps and Charles Willams is more difficult. Those defendants neither had

significant histories of extreme mental or emotional disturbance or disease, nor did the jury believe they exhibited diminished capacity at the time of their crimes. The jury did, however, attach significance to youth or immaturity in three of the four defendants' cases—Jones, Slaughter and Stamps.

Larry Jones, a twenty-seven-year-old defendant who was raised in poverty and with little emotional support from his parents, shot and killed the owner of a seafood and produce distribution business. He and his co-defendant then locked four other employees of the business into a walk-in freezer and left them there. The jury found the c(5)(c)(age) and c(5)(h) (catch-all) mitigating factors. That evidence was presented of Jones' intoxication when he committed the murder may have influenced the jury in its decision not to impose the death penalty.

Rafael Slaughter, a twenty-two-year-old defendant, shot and killed a young employee of a fast-food restaurant because the employee was unable to provide the defendant with the combination to the safe. The jury found the c(5)(c)(age) and c(5)(h) (catch-all) mitigating factors. Evidence of Slaughter's youth and immaturity may have contributed to the jury's decision not to sentence him to death. Testimony by relatives of his helpfulness toward and involvement with his family also may have influenced the jury and may account for the difference between his sentence and Feaster's.

Aaron Stamps, a twenty-six-year-old defendant, shot and killed a security guard in a bank. The jury found the c(5)(c)(age) and c(5)(h) (catch-all) mitigating factors. Here too, the jury apparently believed that Stamps's age or immaturity contributed to the crimes. Moreover, evidence of his low I.Q., troubled childhood and medical history, which apparently precluded him from working, arguably account for his life sentence.

Charles Williams, a twenty-eight-year-old defendant with a history of emotional disturbance, a severely abusive childhood environment and a history of cocaine, marijuana and alcohol use, shot and killed a fast-food restaurant manager. He also shot at and

severely wounded another employee, and shot at a witness as the witness fled the scene. The jury rejected all of the mitigating factors presented by Williams other than the c(5)(h) (catch-all) factor. It found twenty-eight of the fifty catch-all mitigating factors submitted by the defendant. Thus, evidence of his especially horrific and abusive childhood and his subsequent drug and alcohol abuse likely affected the jury's decision not to impose the death penalty.

The case of Abdel Jaber Saleh is difficult for us to reconcile with that of defendant Feaster. Saleh, a twenty-two-year-old defendant with no history of psychological or mental problems, strangled and assaulted his victim in the victim's workplace, a warehouse. Saleh then bound, gagged and set his victim on fire before fleeing the scene. The victim was still alive when he was set on fire. Saleh was steadily employed and had no prior criminal record. The jury found the c(5)(f) (no significant criminal history) and c(5)(h) (catch-all) mitigating factors. As part of that catch-all mitigating factor, the jury found that Saleh's family, including his wife and two-year-old daughter, would suffer emotional and psychological harm if Saleh were executed. The jury was unable to agree on sentencing, thereby precluding imposition of the death penalty. Without more information than that available in the AOC case summary, we are unable to account for the difference in sentencing in this case and that of defendant Feaster.

We acknowledge that the life sentence imposed on defendant Saleh cannot readily be reconciled with defendant's death sentence. Nevertheless, we find no significant evidence of disproportionality based on the comparison of defendant and the subcategory F–2 defendants whose cases proceeded to a penalty trial.

D. *F–2 Cases That Did Not Proceed to Penalty Trial*

We next compare defendant's case with nine cases in the F–2 subcategory that did not proceed to penalty trial. In doing so, we concede the difficulty in comparing defendant's death sentence to the sentences of defendants that are the result of a guilty plea or a

conviction following a non-penalty phase trial. That is largely because the AOC summaries do not indicate specifically the factors that may have contributed to the decision to proceed non-capitally. As we observed in *Cooper II, supra,* "[i]n some cases, the AOC's summary is sufficiently detailed to permit the Court to deduce by inference what considerations may have persuaded the prosecutor to forego a penalty trial. In other cases, the reasons why the prosecutor elected to forego a capital prosecution are less apparent." 159 *N.J.* at 98, 731 *A.*2d 1000. We proceed because, despite those limitations, the comparisons may be useful.

In the comparison cases of Charles Emmanuel, Dwight Hickson, Anthony Inman, Khalif Jones, Harold Rodriquez and Jose Soto, the rationale for the decision to forego capital prosecution can be inferred from the AOC's summary.

Charles Emmanuel, an eighteen-year-old high-school student with an extensive juvenile history and a history of regular marijuana use, pled guilty to felony-murder for the homicide of a fast-food restaurant employee. The AOC coded as present (implying that they were likely to have been found by a jury in the event of a capital prosecution) mitigating factors c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no significant criminal history) and c(5)(h) (catch-all). Among the factors that were likely to have influenced the prosecution in its decision not to prosecute the defendant capitally were the defendant's youth, as well as his apparent intoxication at the time of the murder.

Dwight Hickson, a twenty-six-year-old high school dropout with a history of marijuana, alcohol and angel dust use, and a co-defendant, shot and killed a gas station attendant. The AOC coded as present the c(5)(d) (diminished capacity) and c(5)(h) (catch-all) mitigating factors. The prosecution's decision to prosecute the case non-capitally likely was influenced by the defendant's diminished capacity due to drug abuse at the time of the crime.

Anthony Inman, a twenty-one-year old defendant who was significantly under the influence of drugs and alcohol at the time he committed a homicide, entered a store to rob it. Defendant

shot and killed one of the store's employees. Inman pled guilty to aggravated manslaughter, among other related charges. The AOC coded as present mitigating factors c(5)(d) (diminished capacity) and c(5)(h) (catch-all). It is likely that among the prosecution's reasons for prosecuting the defendant non-capitally were the defendant's youth and diminished capacity due to intoxication at the time of the murder and that Inman apparently did not form an intent to kill until the victim reached for his own weapon.

Khalif James, a nineteen-year-old defendant, shot and killed a gas station attendant. While robbing the gas station, a guard dog bit one of his co-defendants. The defendant was about to shoot the dog when the victim also attacked the second co-defendant. The defendant then shot and killed the victim. The AOC coded as present the (c)(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no significant criminal history) and c(5)(h) (catch-all) mitigating factors. Factors that may have contributed to the prosecution's decision not to prosecute the defendant capitally included evidence that James was intoxicated at the time of the murder, that he may not have intended to kill the attendant but merely intended to wound him by shooting him in the leg and, although insufficient to constitute a legal defense, some evidence of provocation.

Harold Rodriguez, a thirty-seven-year-old unemployed defendant who was married with three children, has a history of severe heroin and cocaine abuse and was diagnosed with AIDS, pled guilty to the murder of a gas station customer. The AOC coded as present mitigating factors c(5)(d) (diminished capacity) and c(5)(h) (catch-all). The prosecution's decision to prosecute the defendant non-capitally apparently was affected by the defendant's diminished capacity due to his intoxication and addiction to heroin and cocaine for over twenty years. That the defendant was married with three children and has AIDS also may have affected the prosecution's decision.

Jose Soto, a nineteen-year-old high school drop-out with a history of alcohol and marijuana use, pled guilty to aggravated manslaughter for the homicide of the co-owner of a Chinese

restaurant. The defendant also shot at the victim's husband. The AOC coded as present mitigating factors c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no significant criminal history) and c(5)(h) (catch-all). Among the factors that may have influenced the prosecution's determination to prosecute the case non-capitally were the defendant's diminished capacity due to intoxication and his youth at the time of the murder.

To determine the reasons that affected the prosecution's decision to proceed non-capitally in some of the other F-2 cases is more difficult because of the apparent absence of decisive factors. Nonetheless, we compare those non-capitally prosecuted cases to defendant's case based on the information currently available to us.

Carl Culley, a nineteen-year-old defendant, murdered a gas station attendant presumably because he did not want the victim to identify him. The AOC coded as present the c(5)(c)(age) and c(5)(h) (catch-all) mitigating factors. Among the factors that may have influenced the prosecution in its decision to prosecute the defendant non-capitally were his age, his lack of a significant criminal history, indications that he was sexually abused as a child, and the defendant's claim that the first shot was fired accidentally when the attendant grabbed the barrel of the gun.

Timothy Harris, a nineteen-year-old defendant with an extensive juvenile record but no prior adult criminal record, shot and killed a store-employee who refused to hand over money to him and his co-defendant. The AOC coded as present the c(5)(c)(age), c(5)(f) (no significant criminal history) and c(5)(h) (catch-all) mitigating factors. The prosecution's decision to prosecute the defendant non-capitally likely was influenced by the defendant's youth and lack of a criminal record.

The lack of detail in the AOC's summary prevents us from discerning a reason, other than the youth of the defendant, why the prosecution chose to prosecute non-capitally the case of Corey Washington. Washington was a nineteen-year-old defendant who pled guilty to the purposeful and knowing murder of the clerk-

employee at a check cashing establishment. The AOC coded as present mitigating factors c(5)(c)(age) and c(5)(h) (catch-all).

In sum, our comparison of defendant's death sentence with the sentences imposed on the nine defendants whose cases did not proceed to a penalty phase within the F–2 subcategory does not lead us to find significant evidence of disproportionality. The AOC's case summaries provide us with sufficient bases to conclude that justifiable reasons apparently existed and accounted for the prosecution's decision to proceed non-capitally against defendants Emmanuel, Hickson, Inman, James, Rodriguez and Soto. Likewise, although it is not as easy to infer the reasons for their non-capital prosecutions, we are satisfied that the prosecution had cogent reasons for proceeding non-capitally in the cases of Culley and Harris. We do not have sufficient information to ascertain whether there was justification for the non-capital prosecution of Washington. When conducting proportionality review, however, "[o]ur primary objective is the detection and prevention of aberrational sentences." *Cooper II, supra,* 159 *N.J.* at 107, 731 *A.*2d 1000 (citing *Loftin II, supra,* 157 *N.J.* at 322, 724 *A.*2d 129). As such, we do not find that defendant Feaster's death sentence is aberrational when compared to the sentences imposed on those defendants within the F–2 category who were not prosecuted capitally.

### E. *Other Categories*

In this section, we compare defendant's case to the cases of two defendants, Donald Loftin and John J. Fauntenberry, who are assigned to categories other than the F–2 subcategory, neither of whose cases proceeded to a penalty phase.

Donald Loftin (1), a twenty-seven-year-old full-time college student, was convicted of murder for the killing of a housekeeper in an Atlantic City casino hotel. The jury found the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(f) (no significant criminal history) and c(5)(h) (catch-all) mitigating factors. The prosecutor's decision to prosecute the defendant non-capitally was likely

influenced by the mitigating evidence tending to show extreme mental or emotional disturbance at the time of the murder. Moreover, a prosecutorial strategy to enable the prior-murder conviction to be offered as an aggravating factor in Loftin's subsequent murder trial may have contributed to the decision to proceed non-capitally.

John J. Fauntenberry, a twenty-seven-year-old unemployed defendant with a history of alcohol, cocaine and LSD abuse, pled guilty to the murder of a truck driver whom he shot once in the head at a truck stop while on his way back to his home in Ohio. The truck driver solicited the defendant for homosexual activity before the defendant killed him. The defendant was subjected to mental and physical abuse at the hands of various step-fathers during his childhood, and there are indications that the defendant witnessed his own sister being sexually abused. The mitigating factor c(5)(h) (catch-all) was found. The prosecution was likely influenced to prosecute the defendant non-capitally by the evidence of the solicitation and defendant's severely abusive childhood. Further, that the defendant already had received a death sentence in Ohio also may have contributed to that decision to try the defendant non-capitally.

F. *Precedent–Seeking Review Conclusion*

As we noted in *Cooper, supra,* 159 *N.J.* 55, 731 *A.*2d 1000, and acknowledge again now, the process of precedent-seeking review is imperfect, subjective and difficult to apply:

> Preliminarily, we acknowledge that the process of conducting precedent-seeking review is inherently subjective and does not lend itself to any analysis based on prescribed standards or factors. In comparing homicides from the standpoint of a defendant's blameworthiness or the extent of victimization, there obviously will be ample room for disagreement over which defendant was more culpable and which homicide was more violent and horrific. Similarly, disagreement is inevitable concerning our effort to distinguish defendants on the basis of their characters and backgrounds. The virtue of precedent-seeking review is that it impels the Court to examine, evaluate, and compare homicides committed by defendants whose crimes were similar to the homicide committed by the defendant whose death sentence is under review, analyze the resulting sentences, and determine whether, in that unique context, the defendant's death sentence is aberrational. The fallibility of

> the process is that it depends almost exclusively on imprecise, subjective reactions by the Court to the comparison cases. Despite its flaws, we remain convinced that the process is an indispensable component of proportionality review and that, properly applied, it can assist the Court in identifying and isolating disproportionate sentences of death.

[*Id.* at 92–93, 731 *A*.2d 1000.]

We also acknowledged in *Cooper* that "our aim in conducting proportionality review is not to insure symmetry, or even a high degree of correlation, in the sentences imposed on comparable defendants. Our primary objective is the detection and prevention of aberrational sentences." *Id.* at 107, 731 *A*.2d 1000. That narrow focus of proportionality review is impelled by New Jersey's capital punishment statute that vests in penalty-phase juries broad discretion to impose or reject death sentences based on the specific jury's balancing of the aggravating and mitigating factors in a specific case. That element of jury discretion virtually assures that there will not necessarily be "symmetry, or even a high degree of correlation" in the sentences imposed on defendants who commit comparable homicides. Our goal in proportionality review, accepting as a fact that correlation of sentences among comparable homicides is unlikely to occur, is to identify and prevent the aberrational imposition of capital punishment.

We have carefully and comprehensively reviewed defendant's death sentence and compared it to sentences imposed on other defendants who committed factually similar homicides. Defendant's lack of remorse for and callous attitude about the cold-blooded, execution-style murder of a defenseless and helpless victim indicate a substantial level of culpability. We are persuaded that defendant's death sentence is not aberrational and is reconcilable with most of the non-death-sentenced defendants' sentences or with the State's decision to prosecute those cases non-capitally. Those cases that are not easily reconcilable are few in number and do not diminish our conclusion that defendant's death sentence is not disproportionate. Although we acknowledge that for some cases, and especially for those that did not proceed to a penalty phase, more detailed information in the AOC's case summaries would enhance the Court's ability to conduct prece-

dent-seeking review, we are persuaded that the information currently available is sufficient to enable us to achieve the goal of proportionality review, detecting and preventing aberrational sentences. Here, we are convinced that defendant Feaster's sentence of death is not aberrational.

## IV

### Other Arguments

Defendant challenges the constitutionality of his death sentence on the grounds of racial discrimination. Defendant argues that the race of the murder victim helps determine which defendants will be capitally prosecuted.

This Court has emphasized repeatedly "our special commitment to equality in the administration of justice." *Marshall II, supra,* 130 *N.J.* at 207, 613 *A.*2d 1059. We have observed that "New Jersey's history and traditions would never countenance racial disparity in capital sentencing." *Ibid.* To do so "would mock ... our ... constitutional guarantee of equal protection of the laws under New Jersey Constitution Article I, paragraph 1." *Ibid.* Concerns about the methodologies employed in proportionality review led us, in *Loftin II, supra,* 157 *N.J.* at 286, 724 *A.*2d 129, to issue an order designating a Special Master and requesting the submission of a report to the Court covering, among other things, "questions relating to the statistical models used in both individual and systemic proportionality review." *Ibid.* On December 1, 1999, Special Master Judge David Baime issued the *Report to the Supreme Court: Systemic Proportionality Review Project* (Dec. 1, 1999) (*Baime Report II* ).

In *In re Proportionality Review Project (II),* 165 *N.J.* 206, 757 *A.*2d 168 (2000) (*Proportionality Review (II)* ), we reviewed thoroughly Judge Baime's findings and recommendations. Judge Baime's report concluded that no reliable statistical evidence of race effect in the application of the death penalty has been produced:

> We find no reliable statistical evidence that the race of the defendant influences death sentencing either at the penalty trial stage or in the larger death-eligible sample of cases. Nor does the statistical evidence support the thesis that the race of the defendant affects which cases progress to a penalty trial. Further, the statistical evidence suggests that the race of the victim does not affect death sentencing rates—killers of white victims are no more likely to receive the death penalty than killers of non-white victims. Finally application of our monitoring system discloses no consistent statistical evidence indicating that the race of the victim affects which cases progress to a penalty trial. However, some of the evidence in that respect is conflicting, and the issue should be revisited when the database increases.

[*Baime Report II, supra,* at 66.]

Accordingly, we concurred in Judge Baime's conclusion that application of the death penalty is not affected by racial bias or discrimination. *Proportionality Review (II), supra,* 165 *N.J.* at 224, 757 *A.*2d 168. We thus reject defendant's argument.

V

Based on our determination that defendant Feaster's death sentence is not disproportionate, we affirm the sentence of death.

## *APPENDIX*

## COMPARISON CASE SUMMARIES

### A.  Penalty Trial Cases

*John Downie*

At 3:35 a.m. on December 25, 1985, Downie robbed a gas station and murdered the attendant. Downie had planned the robbery in advance and had searched for a while before he found an open gas station. When he encountered the gas station attendant on duty, he fired two shots at him. The first shot missed, but the second shot hit the attendant in the chest and killed him. As Downie ran from the gas station, a police officer observed him. Downie shot at the officer four times, but none of the shots hit him. Downie, possessing cash he stole from the gas station, hid in the woods.

Downie is an avidly religious, emotionally disturbed male whose family members were described at trial as dysfunctional and schizophrenic. Downie's mother suffered from depression. His father had a child in an extramarital affair after Downie was born and was rarely home. As a schoolchild, Downie's peers ridiculed him and called him "fatty." Because he was disruptive in school, school authorities referred him to a Child Study team. When Downie was seventeen or eighteen years old, his parents moved to Florida, and they refused to let him move with them in spite of his desire to do so. Downie thus was left behind and lived in a household where he was beaten and abused, and in which there were parties where drugs and alcohol were consumed.

Downie was twenty-four years old when he committed the robbery-murder, but was considerably less mature than most people his age. Downie had suffered a head trauma that may have caused organic personality syndrome. He was unmarried and had never had a steady girlfriend. He was a high-school graduate with no prior criminal record who worked odd jobs. On the night of the crime, he had intended to commit suicide to get even with his family. However, he changed his mind and decided to commit a robbery instead. Downie confessed to committing the murder to the probation officer who prepared his presentence report.

A jury convicted Downie of capital murder, felony murder, attempted murder, robbery, and possession of a weapon for an unlawful purpose. At the ensuing penalty phase, a jury found the c(4)(g) (contemporaneous felony) but rejected the c(4)(f) (escape detection) aggravating factor. The jury found the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no significant criminal history), and c(5)(h) (catch-all) mitigating factors. The mitigating factors were found to outweigh the aggravating factor. Therefore, the jury determined that the death penalty should not be imposed. The court sentenced Downie to an aggregate of life imprisonment plus eighteen years with a thirty-six year parole disqualifier.

### Craig Hart

On April 26, 1984, Hart got into a taxicab at 5:30 a.m. He told the driver that he was going to rob him and ordered the driver to lie face-down in the front seat of the taxi. Hart shot the driver twice in the back of the head. After firing the fatal gunshots, Hart stole the driver's cash, credit card, wallet and watch. Four weeks later, Hart was arrested for committing an unrelated robbery and confessed to the robbery-murder.

Hart was an unemployed twenty-five-years-old high-school graduate who had worked as a mailroom clerk and cabinet maker. He had no prior criminal history. He abused cocaine and marijuana but appeared to have no psychological problems.

Hart pled guilty to purposeful-or-knowing murder and armed robbery. The State prosecuted him capitally. The jury, believing that Hart was intoxicated when he committed the robbery-murder, found the c(4)(g) (contemporaneous felony) aggravating factor and the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no significant criminal history), and c(5)(h) (catch-all) mitigating factors. The aggravating factor was found to be clearly outweighed by the mitigating factors. The court sentenced Hart to life imprisonment for the murder and a consecutive twenty-year prison term for the robbery with an aggregate of a forty-year period of parole ineligibility.

### Jacinto Hightower

On July 7, 1985, Hightower walked into the Cumberland Farms convenience store in Willingboro. Hightower asked Cynthia Barlieb, the store clerk, for a carton of cigarettes. While she was retrieving the cigarettes, Hightower changed the sign on the store's front door from "open" to "closed." He returned to the counter, pulled out a gun, and order Barlieb to open the cash register. She declined, and he shot her in the chest. She continued to refuse to open the register, and he shot her in the neck. Hightower tried to open the register himself and became frustrated by his inability to do so. When he felt Barlieb grab his

leg, he shot her in the head. Hightower dragged her lifeless body into the freezer, turned off the lights and left the store.

Hightower was twenty-one years old and was on leave from the United States Army at the time of the murder. Disciplinary problems caused him to drop out of high school in tenth grade, but he later earned a GED. Psychiatric experts diagnosed him with depressive neurosis, episodic drug and alcohol abuse, borderline personality disorder, narcissistic personality disorder and antisocial personality disorder. A brain defect caused the antisocial personality disorder. His mother had mild affective disorder, experienced mood swings, and had difficulty with impulse control. When Hightower was young, other boys sodomized him; nonetheless, his mother did not seek medical attention for him. Hightower's mother was often absent for long periods of time, engaged in multiple affairs, and told her children that she hated them because they deprived her of freedom. He was raised in an abusive and dysfunctional environment.

A jury convicted Hightower of murder, felony murder, armed robbery and weapons offenses. He asked to be sentenced to death. The jury found the c(4)(c) (torture or depravity), c(4)(f) (escape detection), and c(4)(g) (felony murder) aggravating factors and the c(5)(f) (no prior record) and c(5)(h) (catch-all) mitigating factors. This Court affirmed the convictions but reversed the death sentence because the trial court erroneously instructed the jury that unanimity was required to find mitigating factors. 120 *N.J.* 378, 577 *A.*2d 99 (1990). The State retried Hightower, and the second jury also sentenced him to death. The jury found the c(4)(f) (escape detection) and c(4)(g) (felony murder) aggravating factors and the c(5)(c)(age), c(5)(f) (no prior record), and c(5)(h) (catch-all) mitigating factors. Because the trial court improperly removed a juror during deliberations, this Court again reversed Hightower's death sentence. 146 *N.J.* 239, 680 *A.*2d 649 (1996). Hightower's third penalty trial is pending.

*Roger Hoyte*

In October and November, 1995, Hoyte murdered three taxicab drivers in the Newark area. For the first two killings, he and co-defendants Andres Torres and Larry Mayo called for a taxicab. On each occasion, when the taxi arrived Hoyte got into the back seat of the taxi and shot the driver in the head, fatally injuring him. His co-defendants drove the taxis, took each driver's money, removed their shoes and discarded their bodies.

Only Hoyte and Torres participated in the third murder, which was committed in a similar manner and occurred nearly two weeks after the second murder. The driver survived the first gunshot wound, so Hoyte shot him twice more and stabbed him in the neck. Torres drove the taxi, and he and Hoyte took the victim's money and shoes before dumping his dead body in a garbage can. Hoyte and his co-defendants removed each victim's shoes so the police could not trace to them the fingerprints they had left on the shoes.

Hoyte used the same .22 caliber handgun in all three homicides. He and co-defendant Torres stole the gun a month before the murder, during a burglary of Hoyte's former employer. Two days after the last killing, Hoyte sold the gun for fifty dollars.

Co-defendant Mayo's girlfriend implicated Hoyte and Torres in the well-publicized taxicab-driver murders. Following his arrest, Hoyte confessed, telling the police officers of his and his co-defendants' involvement in the crimes. Hoyte also inculpated Mayo and two other men in an unsolved taxicab-driver murder that had occurred two years earlier.

Hoyte, a twenty-two-year-old unemployed high-school graduate, used heroin, cocaine, and marijuana every day for the three years preceding his arrest. He had a prior arrest for unlawful possession of a weapon that was dismissed pursuant to his participation in a pre-trial intervention program.

Hoyte pled guilty to three counts each of capital murder, felony murder, robbery, carjacking, unlawful possession of a weapon,

possession of a weapon for an unlawful purpose, and conspiracy to commit robbery. He also pled guilty to one count each of burglary and theft. At the penalty phase, the jury found that for each murder the State had proven the c(4)(g) (contemporaneous felony) aggravating factor but it rejected the c(4)(f) (escape detection) aggravating factor. The jury found that the c(5)(c)(age), c(5)(f) (no significant criminal history), c(5)(g) (cooperation with the state), and c(5)(h) (catch-all) mitigating factors were present for each victim. The jury could not unanimously agree on sentencing. The court sentenced Hoyte to an aggregate term of three consecutive life sentences and ninety years of parole ineligibility.

*Larry Jones*

Larry Jones shot and killed his victim, one of two partners in a seafood and produce wholesale distributorship. After he shot him, an employee tried to flee. Jones put the gun against the neck of the surviving partner and threatened to kill the partner if the employee ran away. Jones and co-defendant Eugene Jones (no relation) stole $1000 from the surviving partner's wallet and at least $2000 from the victim. Rejecting a plea to get help for the victim, Jones forced the partner, two employees, and a customer to go into a walk-in freezer in which he locked them before fleeing. The four men escaped from the freezer unharmed.

Jones, twenty-seven years old, received little nurturing in his childhood. His father abandoned the family when Jones was three years old. Jones dropped out of school after completing eighth grade in order to support his family, but rarely worked. He had no emotional or substance abuse problems. Jones had two children who were under psychiatric care. He had an extensive juvenile record. He had seven prior robbery convictions stemming from two incidents. He may have been intoxicated when he committed the murder. He confessed to shooting the victim, but he claimed that the gun went off when the victim grabbed it.

A jury convicted Jones of murder, felony murder, four counts each of robbery and kidnapping, and weapons offenses. The jury found the c(4)(b) (grave risk of death to another person) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(c)(age) and c(5)(h) (catch-all) mitigating factors but rejected the proposed c(5)(d) (diminished capacity) mitigating factor. The jury found that the aggravating factors did not outweigh the mitigating factors and did not sentence Jones to death. The court sentenced him to life imprisonment.

*Robert Weary Morton*

On the night of February 23, 1993, Morton and his co-defendant Alonzo Bryant decided to commit robberies. At about 10:20 p.m., they stabbed Toby Chrostowski in the parking lot of a go-go bar in Burlington Township. Chrostowski survived the stabbing, reported the incident and provided a description of his attackers.

About two hours later, in the early morning hours of February 24, a police officer discovered a gas station attendant, Michael Eck, on the floor of the attendant's office at an Amoco station. Money had been taken from Eck's front pocket, and several cartons of cigarettes were missing from the attendant's booth. Eck had been stabbed in the arm, groin, and chest. Eck told the officer that he had been stabbed by two young black men, and described their car. Eck later died.

That same morning, Morton and Bryant went to a local hospital because Morton had a knife wound. While stabbing Eck, Morton's knife had penetrated his glove and cut his left index finger. His injury, witness identifications of Morton and Bryant, and incriminating statements from Bryant's girlfriend and her roommate led police to arrest Morton and Bryant. Morton admitted to stabbing Eck as Bryant beat him, and said that Bryant had also stabbed Chrostowski. Morton said that Eck offered no resistance and begged to be left alone, and that he killed him to eliminate a witness.

Morton was twenty-five-years old and lived with his mother at the time of the murder. He had been struck by a car at the age of two and suffered a cerebral concussion and brain contusion that left him temporarily paralyzed. At age seven, he was placed in classes for the learning disabled and perceptually impaired. His I.Q. was 82. His mother, who was in special classes as a child, resisted efforts to have Morton placed in special classes. Morton graduated from high school and had worked for K–Mart and a pizza restaurant. He is divorced and has one child. He has no prior criminal convictions. No other mitigating evidence was presented because Morton felt that "there are some things a man must keep private."

Morton was convicted of capital murder, felony murder, four counts of robbery, and two counts of aggravated assault.

The jury found the c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony) aggravating factors but rejected the c(4)(c) (torture or depravity) aggravating factor. The jury found the c(5)(h) (catch-all) mitigating factor but rejected the c(5)(c)(age) mitigating factor. The jury determined that the aggravating factors outweighed the mitigating factors and sentenced Morton to death. Morton also received an aggregate sentence of forth years' imprisonment with twenty years of parole ineligibility. His other convictions merged for sentencing purposes.

*David Mark Russo*

On March 7, 1985 David Mark Russo robbed a gas station in Swedesboro, murdered one of its employees and seriously injured two others. He had planned the crime about two weeks prior to its commission. Russo first attempted to execute his three victims as they lay on the floor. He shot each person at point-blank range, killing Joseph Iovanisci and seriously injuring the other two, Dino Rossi and Ann Kiley. Kiley was seriously brain-damaged.

Russo, thirty-two years old, was intoxicated when he committed the crimes. He had a history of alcoholism, cocaine and heroin

addiction and depression. Russo completed the eleventh grade and later obtained his GED. He enlisted in the Air Force while in eleventh grade and remained in the Air Force until his apprehension. His prior record consists of a weapons offense and a court martial for a drug offense.

A jury convicted Russo of capital murder, felony murder, two counts of attempted murder, four counts of aggravated assault, armed robbery and possession of a weapon for an unlawful purpose. At the ensuing penalty phase, several Air Force Senior Officials testified about Russo's extreme competence at work and his non-violent nature, and that Russo could still contribute to society sufficiently to warrant the jury's not imposing the death penalty. The jury found present the c(4)(b) (grave risk of death to others) and c(4)(g) (contemporaneous felony) aggravating factors but rejected the c(4)(f) (escape detection) aggravating factor. The jury found the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no significant criminal history) and c(5)(h) (catch-all) mitigating factors. The jury concluded that the aggravating factors failed to outweigh the mitigating factors. The court sentenced Russo to an aggregate term of life imprisonment plus forty years with a fifty-year period of parole disqualification.

*Abdel Jaber Saleh*

Abdel Jaber Saleh rented a U–Haul van and drove to Michael Rehani's place of business in Hackensack to consummate a business deal in which Saleh was to buy videocassettes from Rehani. Saleh strangled Rehani and hit him over the head with a crowbar. He then dragged Rehani into his own office, bound and gagged him, doused him with charcoal fluid and set him on fire. Rehani was still alive when Saleh began burning him. While the fire burned, Saleh loaded his van with the videocassettes. Saleh then placed the tapes in a storage area he had rented in his wife's name. Rehani's friends found Rehani burning. They put out the fire but Rehani had died by the time firefighters arrived at the

scene. The medical examiner concluded that the strangulation, head blows, and burns were each capable of causing death by themselves.

Saleh drove to Ohio and from there, flew to Los Angeles. A week after murdering Rehani, Saleh went to a Los Angeles police station and said that he had witnessed two Latino men murdering Saleh. Subsequent investigation revealed that Saleh was the perpetrator of the crime.

Saleh was twenty-two years old at the time of the offense. He was married and had a two-year-old daughter. He worked as a machine operator for his father-in-law's company. He had no mental health or substance abuse problems, and no prior criminal record.

A jury convicted Saleh of capital murder, felony murder, aggravated arson, and robbery. The jury found the c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony) aggravating factors but rejected the c(4)(c) (torture or depravity) factor. It found the c(5)(f) (no significant criminal history), and c(5)(h) (catch-all) mitigating factors but rejected the c(5)(c)(age) factor. The jury could not agree on sentencing. Thus, the court sentenced Saleh to life imprisonment plus thirty years with a forty-five year period of parole ineligibility.

*Rafael Slaughter*

Twenty-two-year-old Rafael Slaughter planned the robbery of a fast-food restaurant and the murder of his victims about three hours in advance of the crimes. As the restaurant employees were preparing to close down the restaurant for the evening, Slaughter approached an eighteen-year-old male employee, who was taking out the trash behind the restaurant, put a gun to his back, ordered him to walk inside the restaurant and asked him for the combination to the safe. When the employee told Slaughter that he did not know the combination Slaughter shot the employee twice in the back from point-blank range. The victim bled profusely, lost consciousness twelve minutes after the shooting, and

died shortly thereafter by drowning in his own blood. Slaughter had also ordered two female employees to the ground, but he did not shoot them. After the shooting, Slaughter left the restaurant empty-handed.

Slaughter's parents were young and immature when he was born. They allegedly neglected Slaughter and gave his brother preferential treatment. Slaughter did not have any substance abuse or emotional problems. He was helpful to his relatives when they needed assistance with chores, babysitting, or other matters.

A jury convicted Slaughter of capital murder, felony murder, and weapons offenses. In the penalty phase, the jury found the c(4)(g) (contemporaneous felony) aggravating factor, and the c(5)(c)(age) and c(5)(h) (catch-all) factors present. The jury determined that the aggravating factor did not outweigh the mitigating factors present and did not sentence Slaughter to death. The court sentenced him to an aggregate of fifty years' imprisonment with thirty years of parole ineligibility.

*Aaron Stamps*

Stamps and his two brothers, co-defendants Melvin and Charles Stamps, conspired to rob a bank. During the robbery, Aaron Stamps shot a middle-aged, married security guard twice in the chest.

Aaron Stamps is a high school drop-out. At the time of the arrest he was twenty-six-years old and unemployed. He had worked previously as a laborer at a sheet metal company. There is no history of psychological problems. Although he used many drugs in the past, Stamps denied using them or being addicted to any substance at the time of the murder. As an adult, Stamps was arrested nine times and, in 1976, was convicted of three counts of armed robbery. At the penalty phase, a psychiatrist testified that Stamps has an I.Q. of 76. He was a relatively good student until the ninth grade when his father, with whom he was very close, left the household. When his grades dropped, Stamps

quit school and got involved with drugs. He worked in an air-conditioning plant but severe asthma forced him to quit. After quitting his job, Stamps stayed home and babysat for his girl-friend's children.

A jury convicted Stamps of murder, felony murder, conspiracy to commit armed robbery, armed robbery and weapons offenses.

The jury found aggravating factor, c(4)(g) (contemporaneous felony) but rejected the c(4)(f) (escape detection) factor. It found the c(5)(c)(age) and c(5)(h) (catch-all) mitigating factors. The jury decided that the aggravating factors did not outweigh the mitigating factors. The court sentenced Stamps to an aggregate sentence of life imprisonment plus twenty years with a forty-year period of parole ineligibility.

*Charles Williams*

After eating a meal at a McDonalds restaurant, Charles Williams walked up to the counter, pulled out a .38 caliber handgun, demanded money from the restaurant manager and ordered two other employees to lie down on top of each other. Williams accompanied the manager as he emptied out the cash registers in the front counter and drive-through area. Williams then ordered the three employees into the back of the restaurant. He ordered the manager to remove money from the safe and told the other employees to lie face down. He then made the manager lie down next to them. Williams shot the manager and one other employee in the head. The other employee escaped from the store although Williams fired shots at him as he ran away. The manager died from the gunshot wound to his head. The employee shot by Williams survived but sustained severe brain damage that left him permanently disabled.

Williams was twenty-eight years old when he murdered the restaurant manager. He has never worked. With several prior convictions for robbery, burglary, theft, assault and resisting arrest, Williams has spent all but ninety-three days of his adult life imprisoned. School authorities placed him in a Special Service

School because he was classified as emotionally disturbed. He abused cocaine, marijuana, and alcohol, but he never received substance abuse treatment. When he was a child, Williams's parents, who were both drug addicts and alcoholics, abused and neglected him. From the age of ten, Williams's father took him drinking at neighborhood bars. His father, who was described as a womanizer and a pimp, forced his paramour and Williams to engage in various sex acts while the father watched. Williams's father sexually abused Williams's sister and once sexually abused Williams. His father also was violently abusive toward Williams's mother, who received numerous black eyes, fractured ribs, and once needed treatment at a hospital. Williams's father broke Williams's ribs when he was nine years old because he had accidentally spilled his father's cocaine. Williams's frequent attempts to protect his siblings from abuse often resulted in his receiving even more abuse. Williams's mother was a prostitute and often left her children home alone while entertaining other men. During these periods of abandonment, Williams would provide food for himself and his siblings by stealing from a local supermarket. Williams's mother suffered several emotional breakdowns.

A jury convicted Williams of capital murder, felony murder, two counts of attempted murder, three counts of robbery, two counts of aggravated assault and four counts of weapons offenses. The jury found the c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony) aggravating factors but rejected the c(4)(b) (grave risk of death to another) aggravating factor. The jury also found the c(5)(h) (catch-all) mitigating factor. The jury could not agree on the appropriate penalty. The court imposed an aggregate sentence of life imprisonment plus ninety-five years with seventy-seven and one-half years of parole ineligibility.

*Joseph Wilson*

Employees of a meat market were working outdoors when nineteen-year-old Joseph Wilson told them not to go inside the

market because "something was about to happen." He then entered the meat-market wearing a ski mask over his face. Wilson walked over to a register where the market owners, Brian Kennedy and Peter Szoke, were bagging merchandise. Wilson pointed a gun at Kennedy. Assuming the gun to be a toy gun, Kennedy pushed the gun away and told Wilson to "get that thing out of here." Wilson then went to Szoke and placed the gun against Szoke's head. Szoke had the same reaction as Kennedy. Wilson shot Szoke in the head, then fled the market. Szoke died a few days later.

Wilson was expelled from school for fighting after the ninth grade. He subsequently worked as a cook, factory worker and gas station attendant. He has a daughter whom he sometimes supports. He does not suffer from any psychological problems. Wilson began abusing alcohol at the age of fifteen, and by the time he was seventeen, he drank alcohol, smoked marijuana and used cocaine daily. Wilson said that at the time of the offense he was under the influence of alcohol and cocaine. In 1986, he was convicted of robbery, common assault and theft.

Wilson was convicted of murder, felony murder, armed robbery, conspiracy, aggravated assault and weapons offenses.

The jury found aggravating factor c(4)(g) (concurrent felony) to be present. The jury also found present all the mitigating factors submitted by Wilson: c(5)(c)(age); c(5)(d) (diminished capacity); and c(5)(h) (catch-all). The jury declined to impose the death penalty and Wilson was sentenced to an aggregate term of life imprisonment with a thirty-three year period of parole disqualification.

## B. Non–Penalty Trial Cases

*Charles Emmanuel*

Although not on duty on the day of the murder, Emmanuel went to the Kentucky Fried Chicken restaurant where he worked and helped his co-workers clean up. Suddenly, Emmanuel pulled out a handgun and shot a co-worker three times, killing him.

When the restaurant manager came out of his office, Emmanuel fired three shots at him but the manager survived. Emmanuel then stole three thousand dollars from the restaurant safe.

Emmanuel was an eighteen-year-old high school student at the time of the offense. He has no mental illnesses. This was his first adult offense, but he committed numerous theft and assault crimes as a juvenile. He began drinking alcohol when he was thirteen and began smoking marijuana daily at the age of sixteen. He was under the influence of alcohol and drugs when he committed the crimes at the restaurant.

Emmanuel pled guilty to felony-murder and attempted murder. He received a life sentence with a thirty-year period of parole ineligibility. The AOC coded as present the c(4)(g) (contemporaneous felony) aggravating factor and the c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no significant criminal history) and c(5)(h) (catch-all) mitigating factors.

*Carl Culley*

Armed with an automatic shotgun and wearing a ski mask and gloves in the early morning hours of November 21, 1983, Culley drove into a gas station intending to rob it. When he told the attendant that he did not have money to pay for the gasoline, the attendant responded that he would call the police unless Culley left his car at the gas station. Culley claims that he then attempted to scare the attendant by pointing the gun at him, but that the attendant grabbed the barrel of the gun and was shot when the gun accidentally discharged. Culley then got out of his car and shot the attendant in the back. The attendant died from the gunshots. In his confession, Culley admitted that he intended to kill the attendant with the second shot to prevent the attendant from identifying him.

At the time of the offense, Culley was nineteen-years old. He was enrolled in college and had worked as a landscaper and maintenance man. He had a prior conviction for theft and crimi-

nal mischief. He claimed that he was sexually abused when he was a child.

Culley was prosecuted non-capitally. A jury convicted him of murder, felony-murder and weapons offenses. The judge sentenced him to thirty years' imprisonment during which he would not be eligible for parole. The AOC coded present the c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(c)(age) and c(5)(h) (catch-all) mitigating factors.

*Timothy Harris*

Harris and co-defendant Laquam Lassiter followed Robert Lee Rose and Audrey Williamson into a retail store in Newark. Pointing a revolver at Rose's head, Harris demanded money. Rose handed Harris a total of $150. Harris then pointed his gun at Williamson and demanded money. She gave him forty dollars but resisted his demands for more money. Frightened, she tried to run behind the store counter but Harris shot her in the head, killing her. Harris told his co-defendant that he shot Williamson because she did not give him all of her money.

Harris, who turned nineteen the month he murdered Williamson, had no prior adult record but had an extensive juvenile record. This offense was his first indictable conviction. He had no psychiatric problems and claimed to have no history of substance abuse. He dropped out of high school after tenth grade and did not work since then.

The prosecutor tried Harris non-capitally. The jury convicted him of murder, robbery, aggravated assault, conspiracy to commit robbery and weapons offenses. The court sentenced him to an aggregate term of life imprisonment plus twenty years with a forty-year period of parole ineligibility. The AOC coded as present the c(4)(g) (escape detection) aggravating factor and the c(5)(c)(age), c(5)(f) (no significant criminal history) and c(5)(h) (catch-all) mitigating factors.

*Dwight Hickson*

Dwight Hickson, Shane Blunt and William Johnson, decided to rob a gas station. Blunt gave Hickson a .25 caliber automatic gun as they walked toward the gas station. The three of them entered the gas station office and Hickson told the attendant that it was a holdup. Hickson saw the attendant come toward him, so Hickson shot the attendant, who fell to the floor.

The attendant was found later that night lying face down in the gas station parking lot. There was a bullet wound in his head, a large pool of blood under his head, and blood on his pants. Police transported the victim to the hospital, where he was pronounced dead. An autopsy revealed that he died as a result of gunshot wounds to the head and leg.

Hickson was twenty-six years old at the time of the murder. He had a history of marijuana, angel dust and alcohol usage.

Hickson's statement to the police implicated all three of the perpetrators. Hickson pled guilty to aggravated manslaughter and robbery, for which he received an aggregate term of forty-six years' imprisonment with a twenty-three period of parole ineligibility.

The AOC coded as present the aggravating factor c(4)(g) (contemporaneous felony) and the mitigating factors c(5)(d) (diminished capacity) and c(5)(h) (no significant criminal history).

*Anthony Inman*

While out looking for drug dealers whom they could rob, twenty-one year old Anthony Inman and co-defendant Wayne Harvey decided instead to rob a grocery store. The pair went inside and Inman pulled out a .45 caliber handgun and ordered the victim, a co-owner of the store, to give money to Harvey, who was aiming his nine-millimeter handgun at the victim. The victim reached for his gun, and Inman shot him twice in the chest. Although the victim yelled to the co-owner to run because he was being shot, the co-owner did not heed the warning but instead ran

into the front of the store and shot Inman twice. Inman and Harvey then fled.

Inman was under the influence of drugs and alcohol when he committed the robbery and homicide. Except for being a heroin addict, Inman had no physical or psychological problems. He lived with his grandfather and was unemployed. He had prior convictions for theft as well as drug and weapons offenses.

Inman pled guilty to aggravated manslaughter, conspiracy, robbery and weapons offenses. The court sentenced him to an aggregate of forty years' imprisonment with a twenty-year period of parole ineligibility.

The AOC coded as present the c(4)(g) (contemporaneous felony) aggravating factor and the c(5)(d) (diminished capacity), and c(5)(h) (catch-all) mitigating factors.

*Khalif James*

James and co-defendants Lawrence McGriff and Jason Means decided to rob a gas station. They were intoxicated at the time. When they got out of their car, McGriff reached the gas station first. When James arrived, he saw McGriff pistol-whipping the gas-station attendant. A guard dog bit McGriff, and James drew his gun, purportedly to shoot the dog. Then, the attendant attacked McGriff, and James fatally shot the attendant in the head.

James was a nineteen-year-old high-school graduate who had worked at a fast-food restaurant. He occasionally used alcohol or marijuana. He had no prior adult convictions. James confessed to shooting the gas-station attendant. He claimed, however, that he had tried to shoot the attendant in the leg and thought that he had shot him in the back.

A jury convicted James of murder, felony murder, robbery and weapons offenses. The court sentenced him to an aggregate term of life imprisonment with thirty years of parole ineligibility. The AOC coded as present the c(4)(g) (contemporaneous felony) aggra-

vating factor and the c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no significant criminal history) and c(5)(h) (catch-all) mitigating factors.

## Harold Rodriquez

Rodriguez and co-defendant Marceliano Guetierrez attempted to rob a gas station. Rodriguez shot and killed a customer and. shot the gas-station owner six times. The owner survived.

At the time of the offense, Rodriguez was thirty-seven years old, married and the father of three children. His parents were not married and he was raised by his father. When Rodriguez was fourteen-years old, he ran away from home. He was unemployed when he committed the murder but had previously worked as a machine operator. He used heroin and cocaine daily for twenty years. Other than substance abuse, there is no indication that Rodriquez had any emotional problems. He suffers, however, from AIDS.

Rodriguez pled guilty to conspiracy to commit murder, murder, attempted murder, two counts of robbery, and weapons offenses. The court sentenced him to an aggregate term of life imprisonment with a thirty-year period of parole ineligibility.

The AOC coded as present the c(4)(b) (grave risk) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(d) (diminished capacity) and c(5)(h) (catch-all) factors.

## Jose Soto

Soto and his co-defendant Eddie Jorge planned to rob a Chinese restaurant. Soto demanded money from one of the co-owners, a twenty-three-year-old woman. When she told him there was no money, he shot her. She died before she could get medical attention. Soto then shot at the other co-owner, the victim's thirty-year-old husband who survived the shooting.

Soto, a nineteen-year-old high school drop-out, had previously worked as a truck driver and delivery man. He claimed to have been working at the same job for the six months prior to his

arrest. He has no history of mental problems but admitted to smoking marijuana daily since the age of thirteen, and to drinking large quantities of alcohol in the month preceding the murder. Soto has no prior criminal record.

Soto pled guilty to aggravated manslaughter and robbery and was sentenced to an aggregate term of fifty years' imprisonment with twenty-three years of parole ineligibility.

The AOC coded as present the c(4)(g) (contemporaneous felony) aggravating factor and the c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no significant criminal history) and c(5)(h) (catch-all) mitigating factors.

### Corey Washington

Corey Washington, John Bultran and Jerome White planned to rob a check-cashing establishment. Washington had previously sold drugs to the clerk at the store and believed that he and his co-defendants would be easily able to get behind the counter. The store door was locked when they arrived and Bultran and White fired gunshots into the floor. The clerk then opened the door and the three perpetrators forced him to open the safe. They ordered him and his sixty-eight-year-old co-worker to lie on the floor while they removed the cash. Before they left, Washington shot the younger clerk in the head, and Bultran shot the older clerk in the head. The younger clerk died, but the older clerk survived.

Washington was nineteen-years-old and lived with his mother at the time of the murder. He dropped out of high school and had some experience working as a laborer. He had no history of substance abuse or mental illness. He had a prior conviction for assault and weapons offenses.

Washington pled guilty to purposeful-or-knowing murder. The court sentenced him to thirty years imprisonment with no parole eligibility. The AOC coded as present the c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(c)(age) and c(5)(h) (catch-all) mitigating factors.

## II.  Other Categories

*Donald Loftin 1(F-3)*

Approximately five weeks before he committed a robbery-murder at the Exxon on Business Route 1 in Lawrenceville, Loftin fatally shot Sophia Fetter, a sixty-nine-year-old chambermaid, in the head while she was cleaning a room in Harrah's Casino Hotel in Atlantic City.  He had fired another shot that missed Fetter. Loftin stole Fetter's keys that opened the guest bedrooms and maintenance closets.

Loftin, who was twenty-seven years old, had no prior record. He had worked in a warehouse and as an armored car driver, and he was a full-time college student when he committed the offenses. Aside from marijuana use as a teenager, Loftin had no substance abuse problems.  A defense expert in the gas-station robbery-murder case concluded that Loftin had borderline personality disorder, but a prosecution expert disagreed with that conclusion. When Loftin was five, his father abandoned the family.  One year later, Loftin set his mattress afire and caused his family home to burn down.  Loftin never received counseling for those traumatic events.

Loftin was tried non-capitally and was convicted of purposeful-or-knowing murder, felony murder, robbery, burglary, and weapons offenses.  The court sentenced him to an aggregate term of life imprisonment plus fifteen years with a thirty-five-year period of parole ineligibility.  The AOC coded as present the c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(f) (no significant criminal history) and c(5)(h) (catch-all) mitigating factors.

*John Fauntenberry (B1)*

John Fauntenberry was at a truck stop in New Jersey with no money as he drove from Connecticut to his home in Ohio.  He tried to sell some of his personal items to finance his trip.  He met a male truck driver who solicited him for sex.  Fauntenberry

accompanied the driver back to his truck, shot him once in the head with a .22 caliber pistol and stole the driver's money and property. The following month, Fauntenberry was arrested in Juneau, Alaska for murder. While in custody, he confessed to committing five other murders, including the truck-stop murder in New Jersey. He admitted that he killed his victims in order to avoid leaving witnesses.

At the time of the murder, Fauntenberry was an unemployed twenty-seven-year-old high-school graduate who had previously worked as a truck driver. He had been discharged from the Navy due to heavy drinking. He also had abused cocaine and LSD. During his childhood, various stepfathers physically and mentally abused him, his mother and his sister. He witnessed his sister being sexually abused, and he himself sexually abused her. He had prior convictions for aggravated assault, theft and carrying a concealed weapon. At the time of the disposition of this case, Fauntenberry had been convicted of murder in Alaska, for which he was sentenced to prison for ninety-nine years, and in Ohio, for which he was sentenced to death. Charges also were pending against him for two of three murders he committed in Oregon.

Fauntenberry pled guilty to non-capital murder and robbery for which he was sentenced to an aggregate of life imprisonment with a thirty-year period of parole ineligibility.

The AOC coded as present the c(4)(a) (prior murder), c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(h) (catch-all) mitigating factor.

LONG, J., dissenting.

The federal and state constitutions instruct that the death penalty must not be applied in an arbitrary, inconsistent, or discriminatory manner. Because no proportionality review, including ours, can sufficiently ensure that the death penalty is applied rationally and consistently, I dissent and would vacate Richard Feaster's death sentence.

## I.

For thirteen years, we have worked diligently to devise procedures to determine whether a death sentence is proportionate. We have commissioned the best members of our judicial family to employ criminal justice experts and statisticians to improve our proportionality tests. Currently, we are in the process of another effort to design effective procedures for proportionality review, *In re Proportionality Review Project*, 165 *N.J.* 206, 757 *A.2d* 168 (2000) (*Proportionality Review II*), and we anticipate ongoing deliberations about how to improve those procedures as more information becomes available.

Despite the enormous effort we have expended, it has become apparent that proportionality review does not provide "a standard of due process protection commensurate with the gravity of the sentence to be imposed." *State v. Bey*, 137 *N.J.* 334, 427, 645 *A.2d* 685 (1994) (*Bey IV*) (Handler, J., dissenting). Because "death is different" in its severity and finality, *Gregg v. Georgia*, 428 *U.S.* 153, 188, 96 *S.Ct.* 2909, 2932, 49 *L.Ed.2d* 859, 883 (1976), merely identifying justifications for a death sentence under review is inadequate. What is required is a comparative sense of rationality and consistency. Although we pride ourselves on the fact that our Constitution provides a "more expansive source of protections against the arbitrary and nonindividualized imposition of the death penalty" than does the United States Constitution, *State v. Ramseur*, 106 *N.J.* 123, 190, 524 *A.2d* 188 (1987), I believe our proportionality review falls short of guaranteeing that the death penalty is administered in a fair and consistent manner.

One reason for the failure is that, despite our efforts to improve proportionality review, we have not yet settled on consistent, meaningful standards for our two tests: salient-factors and comparative culpability. Close scrutiny of our opinions reveals that the standards change from case to case. Since our first proportionality review opinion, *State v. Marshall*, 130 *N.J.* 109, 613 *A.2d* 1059 (1992) (*Marshall II*), we have employed fourteen different descriptions of the standard for disproportionality. *See State v.*

*Harvey*, 159 *N.J.* 277, 355–58, 731 *A.*2d 1121 (1999) (*Harvey III* ) (Handler, J., dissenting).

Equally important is the fact that the standards we employ are applied in a haphazard and arbitrary fashion. Precedent-seeking review has devolved into a litany of pejorative but generic descriptions of defendants accompanied by a catalogue listing of distinctions from comparison cases; there is never any meaningful discussion of why those distinctions are significant. *See State v. Loftin*, 157 *N.J.* 253, 439–40, 724 *A.*2d 129 (1999) (*Loftin II* ) (Handler, J., dissenting), *cert. denied*, 528 *U.S.* 897, 120 *S.Ct.* 229, 145 *L.Ed.*2d 193 (1999). There is also little consistency among our opinions with regard to which objective factors are most significant, which make a case more or less aggravated, and how, procedurally, we are to perform comparisons. It is not that we generally offer irrational analyses, but simply that we have defined the process so loosely that almost any negative description of a defendant or any rationalization for why he was sentenced to death can lead to a conclusion of proportionality.

Many of the deficiencies in proportionality review have been discussed extensively elsewhere. *See In re Proportionality Review Project*, 161 *N.J.* 71, 99, 735 *A.*2d 528 (1999) (*Proportionality Review I* ) (Handler, J., concurring in part and dissenting in part) (criticizing Court's standard for assessing disproportionality); *State v. DiFrisco*, 142 *N.J.* 148, 224, 662 *A.*2d 442 (1995) (*DiFrisco III* ) (Handler, J., dissenting) (pointing to principle of unique assignment); *State v. Martini*, 139 *N.J.* 3, 90–91, 651 *A.*2d 949 (1994) (*Martini II* ) (Handler, J., dissenting) (discussing lack of statistical standard to measure disproportionality under frequency review); *Marshall II, supra*, 130 *N.J.* at 249–50, 263–65, 613 *A.*2d 1059 (Handler, J., dissenting) (criticizing coding of reversed death sentences as death sentences; inconsistency and inherent subjectivity of proportionality tests; inclusion of defendant's own case in frequency analysis; abandonment of generally-imposed standard for proportionality). Rather than repeat those arguments, I simply note that I concur in them and add two additional concerns.

First, the standards used in the salient-factors and comparative culpability tests continue to be so flaccid as to allow the Court to conclude that any death sentence is proportional without engaging in a searching and stringent review. *Cf. State v. Davis*, 116 *N.J.* 341, 356, 561 *A.*2d 1082 (1989) (affirming that heightened concerns and responsibilities in capital cases require searching and stringent review of record). Second, the process of comparative review, by its very nature, has proven to be so subjective and unreliable, that it can no longer be counted on as a guarantee of the fairness demanded by our Constitution. *Cf. State v. Bey*, 112 *N.J.* 45, 95, 548 *A.*2d 846 (1988) (*Bey II* ) (noting that constitutional violations cast "tremendous doubt" on fairness of proceedings) (quoting *Satterwhite v. Texas*, 486 *U.S.* 249, 250, 108 *S.Ct.* 1792, 1794, 100 *L.Ed.*2d 284, 293 (1988)).

## II.

The salient-factors test was conceived as a measure of the correlation between the single most significant aggravating factor in a particular case, the "salient factor," and the death-sentencing rate in a group of cases with the same salient factor. We have said that if the ratio of death sentences to penalty-trial or death-eligible cases is high, then the relatively high rate of death sentencing constitutes "strong evidence of the reliability of [the] defendant's death sentence." *Bey IV, supra*, 137 *N.J.* at 358, 645 *A.*2d 685. A relatively low rate of death sentencing indicates that we should "scrutinize the case for the possible influence of impermissible factors." *Martini II, supra*, 139 *N.J.* at 30, 47, 651 *A.*2d 949. That standard fails in both theory and practice.

By omitting identification of any range of sentencing rates that would constitute strong evidence of the *un* reliability of a defendant's death sentence, the salient-factors test cannot serve as a "coefficient of consistency." *Marshall II, supra*, 130 *N.J.* at 153, 613 *A.*2d 1059. The test is supposed to determine what kinds of murders society regards as most reprehensible, and thus give us more confidence in a death sentence that is in a category deemed

particularly reprehensible. *Id.* at 168, 613 *A.*2d 1059. However, even if the salient-factors test reveals that, in a particular category, the defendant alone was singled out for death, we do not utilize that fact to suggest disproportionality.[1] Indeed, we use salient factors only to determine whether there is a societal consensus *for* the death penalty for certain categories of murders, never to determine whether there is a societal consensus *against* the death penalty. Such a standard is at odds with the growing skepticism in our state about the fairness and propriety of the death penalty. *See* A. 1817, 106 Sess. (N.J. Jan. 11, 2000) (proposing bill abolishing the death penalty in New Jersey); A. 1853, 106 Sess. (N.J. Jan. 24, 2000) (proposing three-year moratorium on imposition of death penalty and creating study commission in interim); Kathy Barrett Carter, *63% of Jerseyans Favor Death Penalty,* The Star–Ledger, Oct. 10, 1999 (reporting poll results that 63% of New Jersey residents approve of death penalty, down from 72% in 1994, although 56% believe it is disproportionately imposed on the poor, 42% believe it is disproportionately imposed on African–Americans, and only 44% support death penalty if life without parole available).

Since 1987, when a record nine death sentences were handed down, no more than four death sentences have been imposed in any year. In 1998–99, out of thirty-three death-eligible cases and twelve capital trials, juries handed down only two death sentences. Only one death sentence has been imposed this year after six penalty-phase trials. To inquire whether there is a societal consensus that the death penalty is an appropriate punishment for a certain category of homicides, *see State v. Cooper,* 159 *N.J.* 55, 72, 731 *A.*2d 1000 (1999) (*Cooper II* ), while ignoring the fact that our

---

[1] For instance, Robert Marshall and John Martini were both in salient factor subcategories with death sentencing rates of zero percent, excluding their own case. *Marshall II, supra,* 130 *N.J.* at 168, 613 A.2d 1059; *Martini II, supra,* 139 *N.J.* at 33, 651 A.2d 949. In Marshall's subcategory, none of the three other death-eligible cases resulted in the death penalty, and in Martini's subcategory, none of the five other death-eligible cases resulted in the death penalty. *Ibid.* Still, their death sentences were upheld as not disproportionate.

juries are increasingly reluctant to impose the death penalty, is difficult to rationalize.

A more practical problem is that we do not relate differing salient-factors test outcomes to precedent-seeking review to ensure that the two proportionality tests are "complementary, can confirm each other, and can be compared to each other." *Harvey III, supra,* 159 *N.J.* at 315, 731 *A.*2d 1121. Indeed, it is apparent that we do not link the level of scrutiny we accord to precedent-seeking review at all to the outcome of the salient-factors test. Rather, our opinions reveal that we conduct precedent-seeking review with the same degree, or an even lesser degree, of scrutiny in cases with relatively low death-sentencing rates. For example, the defendants in *Marshall* and *Martini* were classified in subcategories with the lowest possible death sentencing rates (i.e., zero percent excluding those defendants). A reasonable person would expect a concomitantly enhanced precedent seeking review. On the contrary, the opinions in those cases provide the briefest discussion of comparative culpability—three and six pages, respectively. *Marshall II, supra,* 130 *N.J.* at 181–82, 185–86, 187–88, 613 *A.*2d 1059; *Martini II, supra,* 139 *N.J.* at 74–79, 651 *A.*2d 949. Ironically, the cases with more in-depth comparative culpability analyses are those with higher frequencies of death sentencing. *See, e.g., State v. Chew,* 159 *N.J.* 183, 211–20, 731 *A.*2d 1070 (*Chew II* ), *cert. denied,* —— *U.S.* ——, 120 *S.Ct.* 593, 145 *L.Ed.*2d 493 (1999); *Loftin II,* 157 *N.J.* at 336–45, 724 *A.*2d 129.

The salient-factors test should be fully integrated with precedent-seeking review. Where similar cases result in a relatively high rate of death sentencing, precedent-seeking review should be used to determine whether the subject case is more analogous to the large group of death-sentenced cases or the smaller group of life-sentenced cases. *See* David T. Baldus, Special Master, *Death Penalty Proportionality Review Project Final Report to the New Jersey Supreme Court* at 34 (Sept. 24, 1991). Conversely, in a case where comparison cases generally result in life sentences, we should use precedent-seeking review to determine whether the

case under review is among the most culpable of the comparison cases.

As it presently plays out, the salient-factors test reveals nothing about the comparative appropriateness of a particular death sentence and does nothing more than "set the stage for whatever subjective determinations or moral judgments might be made under the precedent-seeking approach." *Martini II, supra,* 139 *N.J.* at 106–07, 651 *A.*2d 949 (Handler, J., dissenting) (citations omitted).

### III.

After completing the salient-factors test, the Court selects similar cases from a defendant's salient factor subcategory, and compares the defendant's case with AOC summaries of similar cases in that subcategory. Specifically, we are directed to examine the particular facts of the defendant's case relative to other cases, compare both the cases' statutory aggravating and mitigating factors, and objective non-statutory factors indicative of culpability such as gruesomeness of the offense, mental capacity of the defendant, and prior criminal record. *See Harvey III, supra,* 159 *N.J.* at 294, 731 *A.*2d 1121; *Chew II, supra,* 159 *N.J.* at 198, 731 *A.*2d 1070; *DiFrisco III, supra,* 142 *N.J.* at 183, 662 *A.*2d 442. Taking into account the different facts, defendants, juries, and legal issues in each case, we must determine whether similarly situated defendants are generally given life sentences. *See Bey IV, supra,* 137 *N.J.* at 369, 645 *A.*2d 685. Theoretically, the death sentence under review will be overturned if it does not follow a typical sentencing pattern. *Ibid.* In practice, it has never happened.

The most significant problem with the standard for the comparative culpability test is that it is not truly comparative. Although we believe, in theory, that "no matter how heinous the crime, we focus, finally, on individual defendants; their acts and their lives," *Loftin II, supra,* 157 *N.J.* at 279, 724 *A.*2d 129, we have not done so in practice. Realistically, our analyses more closely resemble

traditional, non-comparative proportionality review because they primarily discuss whether a particular death sentence is appropriate as an abstract issue, separate from whether it is disparate relative to results in other cases.[2]  Instead of questioning whether a particular death sentence is aberrant when compared to the sentences imposed on defendants in factually similar cases, *Harvey III, supra,* 159 *N.J.* at 307, 731 *A.*2d 1121, we, in effect, merely ask whether there exists any possible justification at all for the death sentence and if satisfied, accept the sentence as proportional.

A telling example of our turn toward traditional proportionality review may be seen in our most recent proportionality opinions. Starting with *Martini,* we began the practice of prefacing our case comparisons with an analysis of the defendant's culpability.  139 *N.J.* at 74–76, 651 *A.*2d 949.  In that analysis, we assess the defendant on an undefined scale of low, average, and high culpability.  The assessments are made with no reference to comparison cases, only to the Court's intrinsic sense of morality.

More important, in the actual comparison section of our opinions, no true comparison occurs.  We consistently validate death sentences despite similar cases in which the defendant received a life sentence.  The way we achieve that result is by focusing all our attention on a single feature.  *See, e.g., Ante* at 412–13, 757 *A.*2d at 280 (distinguishing defendant's case from life-sentenced cases based on lack of single mitigating circumstance); *Harvey III, supra,* 159 *N.J.* at 317–18, 731 *A.*2d 1121 (same).  There is rarely, if ever, an explanation of why the distinction is significant. In my view, by honing in on the presence or absence of just one or a few factors in a defendant's case, the Court fails to honor its duty to evaluate a defendant's culpability by an entire *set* of

---

[2] Traditional proportionality review requires a court to determine whether, on an abstract level, a crime is heinous enough to justify the imposition of the death penalty.  In contrast, our statute directs us to consider a defendant's sentence only as it compares to other sentences for similar crimes.  *Marshall II, supra,* 130 *N.J.* at 129–30, 613 *A.*2d 1059.

objective factors relevant to blameworthiness, victimization, and character.[3]  *Martini II, supra,* 139 *N.J.* at 50, 651 *A.*2d 949.

Worse, it has been our practice to focus almost exclusively on the aggravating circumstances of the case under review while underscoring the mitigating circumstances of comparison cases, and thus distorting the comparison process altogether.  *See, e.g., Harvey III, supra,* 159 *N.J.* at 316–19, 731 *A.*2d 1121 (highlighting ugly facts and minimizing mitigating evidence in defendant's case and using opposite focus in comparison cases).  The results of such an analysis will inevitably be biased toward the State's position and lead us to render inaccurate conclusions.

The Court's typical precedent-seeking review suffers not only from its superficiality and predetermined result, but from the inconsistency of its approach in labeling a defendant more or less culpable.  Some of the factors that the Court considers in categorizing a defendant as highly culpable are so vague and universally applicable as to be meaningless.  *See, e.g., Harvey III, supra,* 159 *N.J.* at 319, 731 *A.*2d 1121 (finding defendant's culpability heightened because he was "cold and calculating"); *DiFrisco III, supra,* 142 *N.J.* at 205, 662 *A.*2d 442 (determining defendant's culpability was heightened because "at the end of the day there is still a victim"); *Bey IV, supra,* 137 *N.J.* at 384, 645 *A.*2d 685 (concluding defendant's culpability heightened because mitigating evidence was contested).

With other factors, defendants are proverbially damned if they do and damned if they don't.  For example, in *Chew II, supra,* 159

---

[3] The complete list of objective factors that the Court is supposed to use to evaluate a defendant's relative culpability is as follows: motive, premeditation, justification or excuse, evidence of mental disease, defect, or disturbance, knowledge of victim's helplessness, knowledge of effects on nondecedent victims, defendant's age, defendant's involvement in planning the murder, violence and brutality of the murder, injury to nondecedent victim, prior record, other unrelated acts of violence, cooperation with authorities, remorse, capacity for rehabilitation.  *Marshall II, supra,* 130 *N.J.* at 155, 613 *A.*2d 1059.

*N.J.* at 213, 731 *A.*2d 1070, we found that the defendant's relative culpability was high because he failed to confess. On the contrary, in *Cooper II, supra,* 159 *N.J.* at 102, 731 *A.*2d 1000, we said that a comparison case was less deathworthy because the defendant claimed a co-defendant had committed the murder. *Cf. DiFrisco III, supra,* 142 *N.J.* at 206, 662 *A.*2d 442 (explaining defendant's relative culpability was high because he confessed but for reasons unknown to Court); *Bey IV, supra,* 137 *N.J.* at 385, 645 *A.*2d 685 (finding defendant's relative culpability high because he waited until penalty phase to confess).

Execution-style killing is likewise a double-edged sword. The Court has determined, by turns, that it made one defendant more deathworthy and another less deathworthy. *Compare Loftin II, supra,* 157 *N.J.* at 338, 724 *A.*2d 129 (noting execution-style killing indicative of low victimization) *with DiFrisco III, supra,* 142 *N.J.* at 205, 662 *A.*2d 442 (noting execution-style killing indicative of high victimization). Killing for money is also Janus-like. *Compare DiFrisco III, supra,* 142 *N.J.* at 209, 662 *A.*2d 442 (determining pecuniary motive indicates high culpability) *with Chew II, supra,* 159 *N.J.* at 217, 731 *A.*2d 1070 (determining defendant in comparison case less culpable because, out of loyalty and friendship, he killed for money).

Other factors that the Court has used to upgrade or downgrade a defendant's culpability are similarly unjustifiable. In *DiFrisco III,* we said that it was worse to perform a murder for hire and thus kill for purely pecuniary gain, than it was to be the hirer and employ someone to kill a "destructive" family member. 142 *N.J.* at 208–09, 662 *A.*2d 442. In *Loftin II,* we said that being the victim of only "sporadic" child abuse makes a defendant more deathworthy than one who was subject to "chronic" child abuse. 157 *N.J.* at 340, 724 *A.*2d 129. In *Harvey III* we said that a defendant who intended to inflict a bodily injury that he knew would probably result in death was less deathworthy than a defendant who intended to cause death, despite the fact that the Legislature has deemed both mental states equally culpable. 159

*N.J.* at 317, 731 *A.*2d 1121. Inexplicably, in *Cooper II*, we found two murders less deathworthy because, in one case, the fatal events began as a consensual social encounter, and in the other, because the victim bought drugs from the defendant. 159 *N.J.* at 99, 112, 731 *A.*2d 1000. In *Bey IV*, we determined that a defendant who lacked much-needed mental health care as a child was more culpable than another defendant because the other defendant was institutionalized as a child. 137 *N.J.* at 384, 645 *A.*2d 685.

Those value judgments are not only purely subjective, they are, for the most part, objectively unreasonable. Giving our stamp of approval to a sentence of death based on analyses such as those contradicts our long-standing commitment to "ensure that the death penalty is being administered in a rational, non-arbitrary, and evenhanded manner, fairly and with reasonable consistency." *Marshall II, supra,* 130 *N.J.* at 131, 613 *A.*2d 1059.

Despite our heavy, almost exclusive reliance on precedent-seeking review, *see, e.g., Cooper II, supra,* 159 *N.J.* at 88, 731 *A.*2d 1000, it is, in practice, as meaningless as frequency analysis. Although we are clear in our mission, namely to determine whether a particular death sentence is aberrant when compared to the sentences received by defendants in factually similar cases, we have offered no guidance about how to actually conduct the comparison except in the grossest of terms. *See Harvey III, supra,* 159 *N.J.* at 307, 731 *A.*2d 1121; *Chew II, supra,* 159 *N.J.* at 210, 731 *A.*2d 1070. In practice, comparative culpability analysis has become free-form, sloppy and inconsistent from case to case. Unsurprisingly, it has injected an impermissible degree of randomness into proportionality review.

In the past, we have recognized problems with the subjective evaluations inherent in precedent-seeking review. *Cooper II, supra,* 159 *N.J.* at 92–93, 731 *A.*2d 1000. Despite the obvious deficiencies in the process, we have nonetheless stayed the course, declaring that it is useful to go through the mechanics of comparative review, and that, "properly applied," it can help the court

identify disproportionate death sentences. *Id.* at 93, 731 *A.*2d 1000. I do not share the Court's optimism that simply going through the motions of comparative review satisfies our constitutional duty to distinguish between proportionate and disproportionate death sentences. We have not fulfilled our promise to make our subjective value judgments "explicit, so that they can be analyzed and tested against whatever objective measurements are applicable." *Marshall II, supra,* 130 *N.J.* at 120, 613 *A.*2d 1059. Our personal moral assessments, thinly disguised as objective conclusions, are not subject to any meaningful guidelines, measurements, or criteria. Simply put, our Constitution demands more.

### IV.

Even with better standards, I doubt that, in light of the inescapable subjectivity of proportionality review, any form of it will be workable. Again, that is not to say that the Court has failed to invest extraordinary resources to create a fair, impartial, and objective proportionality review process. *See Proportionality Review I, supra,* 161 *N.J.* at 71, 735 *A.*2d 528; *In re Proportionality Review,* 122 *N.J.* 345, 585 *A.*2d 358 (1990). The dangerous result of that investment, however, has been to imbue our flawed process with an aura of scientific accuracy. That is pseudo-science at its core: the application of mathematical methods to an inherently subjective effort to give the observer unwarranted confidence in an outcome. *State v. J.Q.,* 252 *N.J.Super.* 11, 40, 599 *A.*2d 172 (App.Div.1991), *aff'd,* 130 *N.J.* 554, 617 *A.*2d 1196 (1993).

Through our procedures for proportionality review, we have tried to insulate ourselves from the kind of subjective decisions that capital juries face. The quantitative salient-factors test and the comparison of objective factors in precedent-seeking analysis appear to narrow our discretion. That appearance is deceiving. Without the benefit of witnessing a live defendant and his mitigating evidence, it is almost impossible not to be overwhelmed by the stark and often bloody description of a murder scene and the

defendant's gruesome acts. Indeed, "[f]aced with a horrific crime and overwhelming evidence of guilt, reviewing courts are often unable to imagine that a jury would have imposed any sentence but death." *State v. Marshall,* 148 *N.J.* 89, 248, 690 *A.*2d 1 (1997) (*Marshall III* ). Thus, although much of our death penalty jurisprudence struggles with limiting jury discretion, even more questionable is our own exercise of discretion.

It is time to acknowledge that the reasoned comparison of objective factors is not merely a difficulty, but a practical impossibility. While recognizing that precedent-seeking review "depends almost exclusively on imprecise, subjective reactions by the Court to the comparison cases," we have forged ahead because it impels us "to examine, evaluate, and compare" similar crimes and thereby determine whether a particular sentence is aberrational. *Cooper II, supra,* 159 *N.J.* at 92–93, 731 *A.*2d 1000. The latter goal cannot be achieved in light of the former problem.

The determination that a history of drug abuse suggests comparatively less blameworthiness, or that shooting a victim at close range rather than from afar suggests more blameworthiness, may be constant among the subjective views of a majority of the Court, but that does not make the determination objectively reasonable. By making such comparisons, we not only reach untoward results, thinly veiled as "objectivity," but we do a disservice to the victims of terrible crimes characterized as "low victimization" incidents, as well as to defendants whose lawyers are simply less skilled in describing their traumatic life histories in such a way to make them relatively more "compelling" to us. *Loftin II, supra,* 157 *N.J.* at 340, 724 *A.*2d 129. Although the criminal law often crudely translates human behavior and thought processes into legalistic categories, "the imposition of death by public authority is ... profoundly different from all other penalties...." *See Ramseur, supra,* 106 *N.J.* at 326, 524 *A.*2d 188 (quoting *Lockett v. Ohio,* 438 *U.S.* 586, 605, 98 *S.Ct.* 2954, 2965, 57 *L.Ed.*2d 973, 990 (1978)). With ten to twenty gruesome murder cases to review, we cannot hope to impose order on varying expressions of human suffering

and human evil. In the end, despite our good efforts, an imper-missible degree of randomness will persist. *See Martini II, supra*, 139 *N.J.* at 100, 651 *A.*2d 949 (Handler, J., dissenting). In New Jersey, "there is no meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Furman v. Georgia*, 408 *U.S.* 238, 313, 92 *S.Ct.* 2726, 2765, 33 *L.Ed.*2d 346, 392 (1972) (White, J., concur-ring). Although we may try to explain why certain defendants are sentenced to death and others to life, in the end our conjecture is only that.

In *Ramseur*, we stated that the paramount purpose of propor-tionality review is consistency—achieving similar results in similar cases. 106 *N.J.* at 330–31, 524 *A.*2d 188. Stated another way by former Special Master Baldus, proportionality review was estab-lished "to insure that the cases in which death sentences are carried out can be meaningfully distinguished from those cases in which lesser penalties are normally imposed," and to limit death sentences to only the most aggravated cases for which "death sentences are the usual routine practice." *Baldus Report* at 25 n. 23.

It is obvious to me from reviewing the AOC case summaries that similarly situated defendants who have committed similar crimes often receive vastly different sentences. *Cf. Pulley v. Harris*, 465 *U.S.* 37, 68, 104 *S.Ct.* 871, 889, 79 *L.Ed.*2d 29, 51–52 (1984) (Brennan, J., dissenting) (describing unpredictability of capital sentencing nationwide). New Jersey juries infrequently impose the death penalty and we assume that juries reserve the death penalty for the worst crimes. *Loftin II, supra*, 157 *N.J.* at 322, 724 *A.*2d 129 (quoting *Marshall II, supra*, 130 *N.J.* at 153, 613 *A.*2d 1059). Based on the fact that the death-sentencing rate for all death-eligible cases is thirteen percent and the total death-sentencing rate at penalty trial is thirty percent, we have conclud-ed that "[t]he low rates show a proper reservation of the death sentence for only the truly worst murderers." *Martini II, supra*, 139 *N.J.* at 80, 651 *A.*2d 949. It is tempting to believe the

argument that the infrequent imposition of death sentences in this state is the result of careful funneling of cases, leaving death row for only the most "deathworthy." However, experience shows that that is not true. Numbers only reflect the quantity of death sentences meted out, not the deathworthiness of the crimes for which it has been imposed.

Currently, there are fourteen men on death row.[4] From August 1982, when the new death penalty statute was enacted, until December 1999, only about ten percent of the 555 death-eligible cases have resulted in a death sentence. Juries imposed a death sentence in only fifty-seven cases—one fifth of the 276 capitally-prosecuted cases. Of those fifty-seven death sentences, this Court has vacated thirty-nine death sentences because of constitutional errors that deprived the defendant of a fair trial.[5]

A review of those cases reveals that there is no indication that the men on death row are the most culpable among the state's murderers or that they committed the most gruesome crimes. Indeed, it is much more likely that a host of factors other than culpability, moral blameworthiness and character are determinative of who is sentenced to life and who is sentenced to death. The competence (or incompetence) of defendant's trial counsel, the resources of the county in which the crime was committed, the popularity of the death penalty in that county, the notoriety of the victim, the defendant's financial resources, the particular policy of the county prosecutor, the race of the defendant and/or victim(s), and the publicity surrounding the crime are probably better predictors of a jury's life and death decision. *See, e.g.,* American Bar Association Death Penalty Moratorium Resolution (Feb. 3, 1997) (citing incompetent counsel and racial discrimination as

---

[4] Two death row inmates died of natural causes, including Joseph Harris who received two death sentences; one died as a result of a homicide.

[5] Recalculating death sentencing rates in light of reversals shows that only seven percent of penalty phase cases and three percent of all death-eligible cases have resulted in the death penalty.

barriers to fair administration of death penalty); Stephen B. Bright, *Counsel for the Poor: The Death Sentence Not For the Worst Crime But For the Worst Lawyer*, 103 *Yale L.J.* 1835 (1994); David S. Baime, *Systemic Proportionality Review Project: Report to the New Jersey Supreme Court* at 54 (Dec. 1, 1999) (reporting that although Caucasian-victim cases constitute only 46% of death-eligible cases, 62% of death sentences imposed were for Caucasian-victim cases); Leigh B. Bienen et al., *The Re–Imposition of Capital Punishment in New Jersey: The Role of Prosecutorial Discretion, Rutgers L.Rev.* (1988) (tracking higher risk of capital prosecution in particular group of pro-death penalty counties, especially for African–American defendants with Caucasian victims).

Although we have concluded that no defendant, as yet, has been able to supply "relentless documentation" of the effect of those factors on a particular death sentence, the State has never shown that those factors do not affect sentencing decisions. Moreover, any savvy observer of the death penalty over the past two decades can not help but be at least skeptical about the insulation of death sentencing decisions from those impermissible factors. David Weisburd, *Good for What Purpose?: Social Science, Race and Proportionality Review in New Jersey*, Hebrew University of Jerusalem (visited July 21, 2000) (http://mishpatim.mscc.huji.ac.il/newsite/ CrimeGroup/weisburd/workpap.htm) (printed in *Social Science, Social Policy and the Law*, Russell Sage, R. Kagan, P. Ewick and A. Sarat eds. (1999)).

The outcome of penalty phase decisions may also be explained in part by the common grant of mercy by our state's juries. However, it appears that mercy is not apportioned rationally or based on factors similar to those examined by the Court for precedent-seeking review.[6] *See California v. Brown*, 479 *U.S.*

---

[6] The factors are: motive, premeditation, justification or excuse, evidence of mental disease, defect, or disturbance, knowledge of victim's helplessness, knowledge of effects on nondecedent victims, defendant's age, defendant's in-

538, 561–62, 107 *S.Ct.* 837, 849–50, 93 *L.Ed.*2d 934, 952–53 (1987) (Blackmun, J., dissenting) ("While the sentencer's decision to accord life to a defendant at times might be a rational or moral one, it also may arise from the defendant's appeal to the sentencer's sympathy or mercy, human qualities that are undeniably emotional in nature."). Mercy can depend on a multitude of factors: a defendant's good looks, the enthusiasm and support of his family members, the jury's identification with his background, or the status of the victim (an essayist of note once observed that our society is more outraged at crimes perpetrated against college girls than those against cocktail waitresses). Such factors are infinite, personal, and often inexplicable. *See Saffle v. Parks,* 494 *U.S.* 484, 493, 110 *S.Ct.* 1257, 1262–1263, 108 *L.Ed.*2d 415, 427–28 (1990) (rejecting instruction permitting jury to consider sympathy because it would "allow[ ] the fate of a defendant to turn on the vagaries of particular jurors' emotional sensitivities").

Proportionality review is at once an essential element of the appellate process and, as presently constituted, inadequate to the task. It simply fails to meet the constitutional mandate of providing meaningful appellate procedures to ensure against an arbitrary and capricious death penalty system.

## V.

Separate and apart from my reservations about proportionality review in general, it is clear that the way the Court applied it in Richard Feaster's case was unjust and that, even if its methodology is accepted, Feaster's sentence is disproportionate, considering both the crime and the defendant.

### A. *Salient–Factors Test*

To begin, I note the anomalous fact that Feaster's own case is included in the salient-factors test's statistics. It is incomprehen-

---

volvement in planning the murder, violence and brutality of the murder, injury to nondecedent victim, prior criminal record, other unrelated acts of violence, cooperation with authorities, remorse, and capacity for rehabilitation.

sible to me that in determining whether a particular death sentence is in conformity with a sentencing pattern, the pattern includes the case under review. In such a scenario, a death sentence confirms its own propriety. *Marshall II, supra,* 130 *N.J.* at 263, 613 *A.2d* 1059 (Handler, J., dissenting).

Equally troubling is the fact that one of the death-sentenced F–2 cases included in Feaster's category is that of Robert Morton, whose case we also decided today. In that case the Court upheld Morton's death sentence finding it not disproportionate.[7] There is a tautological problem with upholding the validity of Feaster's sentence based on the assumed validity of Morton's sentence and simultaneously upholding the validity of Morton's sentence based on the assumed validity of Feaster's sentence.

As problematic is the fact that, of the four other cases in the F–2 subcategory that resulted in a death sentence, none has yet been affirmed after proportionality review. The two sentences imposed on Jacinto Hightower have since been vacated because they resulted from constitutionally deficient trials. Ronald Long's death sentence has also been overturned and he has since pled guilty to non-capital murder. Morton's death sentence has been deemed not disproportionate only today.

Excluding Feaster's case under the salient-factors test, thirteen percent of death-eligible cases in the F–2 category result in the death penalty, compared to eleven percent overall. Excluding both Feaster and Morton, as I believe we should, the death sentencing rate among all death-eligible cases in the F–2 subcategory is only ten percent, and the death sentencing rate for those proceeding to the penalty phase is only nineteen percent. From the group of F–2 cases, it is impossible to find a "societal consensus" that the death penalty is an appropriate punishment

---

[7] I dissented in that case as well. *State v. Morton,* 165 *N.J.* 235, 287–88, 303, 757 A.2d 184 (2000) (Long, J., dissenting).

for the F–2 subcategory of homicides. *See Cooper II, supra,* 159 *N.J.* at 72, 731 *A.*2d 1000.

## B. *Comparative Culpability Test*

### 1. Defendant's Culpability

Concluding from the salient-factors test that, at the very least, the vast majority of F–2 cases result in life sentences, precedent-seeking analysis should inform us whether Feaster was "singled out unfairly" for the death penalty, or whether he was truly among the most culpable of the F–2 defendants   A searching comparison of F–2 cases demonstrates that Feaster is far from the most culpable of the F–2 defendants.   His case more closely resembles the large majority of cases that resulted in life sentences and his death sentence should accordingly be vacated.

The precedent seeking analysis in the Court's opinion, as in all prior proportionality review opinions, is a subjective moral evaluation of Richard Feaster as opposed to the comparative analysis that is promised.   The bulk of the precedent-seeking analysis is devoted to recounting defendant's crime and setting forth comparison case summaries.   Scant attention is paid to the actual comparison of objective factors in each case.   That analysis is exactly the kind of traditional, offense-oriented proportionality review that we have directly rejected. *See, e.g., Marshall II, supra,* 130 *N.J.* at 129–30, 613 *A.*2d 1059.

Without reference to comparison cases, the Court characterizes Feaster's level of moral blameworthiness as "average to high" by weighing his youth and lack of premeditation against the victim's vulnerability, lack of justification or excuse, and "complete callousness." *Ante* at 404–06, 757 *A.*2d at 275–76.   The factors supporting the Court's "average to high" rating are illusory because they are factors present in nearly all death-eligible cases.   The description of a "completely callous crime" committed against a "vulnerable victim" without justification or excuse can be applied to nearly every case in the death-eligible universe and certainly to all the cases in Feaster's comparison group.   Calling a defendant a "cold

and calculating murderer" may be fitting, but the descriptor is useless insofar as it is applicable to every person who commits a death-eligible crime. As such, it has no place in proportionality review. *Harvey III, supra,* 159 *N.J.* at 319, 731 *A.*2d 1121. The Court's discussion of victimization and character suffer from similar problems of subjective, standardless evaluation. *Ante* at 406, 757 *A.*2d at 276. Its determinations that victimization was "average to low" in Feaster's case and that Feaster's character demonstrated "average to high" culpability, *ante* at 406, 757 *A.*2d at 276, are based solely on visceral reactions that imply nothing about Feaster's relative death-worthiness. The Court's discussion of the degree of victimization, in fact, directly contravenes our opinion in *Loftin II.* 157 *N.J.* at 338, 724 *A.*2d 129. There, we analyzed a very similar "execution-style" shooting, but rather than labeling it as "average to low" victimization, we stated that "[i]n comparison to other murder cases we have examined, this was not a particularly violent or brutal killing." *Ibid.* The Court also fails to explain how Feaster's lack of cooperation with authorities and allegedly callous comments to the jailhouse snitch [8] are so negatively probative in light of mitigating circumstances such as his minimal criminal record, capacity for rehabilitation, and the testimony that he cried and expressed remorse and disbelief when driving home on the night of the murder.

Even more disturbing is the fact that in *Loftin II,* we characterized the facts of Feaster's case in a good light relative to moral blameworthiness to demonstrate that Loftin was more culpable than Feaster. *See Loftin II, supra,* 157 *N.J.* at 340–41, 724 *A.*2d

---

[8] Testimony by jailhouse informants is especially problematic in and of itself. Steve Mills and Ken Armstrong, *The Jailhouse Informant,* Chicago Tribune, Nov. 16, 1999 (describing "jailhouse snitch" testimony as leading cause of wrongful capital convictions); Samuel R. Gross, *Lost Lives: Miscarriages of Justice in Capital Cases,* 61 *Law and Contemp. Problems* 125, 138–39 (1998) (citing examples of informant testimony resulting in capital conviction of innocent persons); Mark Curriden, *No Honor Among Thieves,* ABA Journal (1989) (same).

129. In that opinion, we said that Feaster presented "uncontroverted evidence" that he suffers from a mental disease or defect, namely encephalopathy, "an injury to the left frontal lobe region making him more violence prone." *Id.* at 340, 724 *A.*2d 129. We also recognized in *Loftin II* that Feaster was relatively young at the time of the offense and still leading the life of a juvenile (e.g., living with his parents and lacking employment). *Id.* at 341, 724 *A.*2d 129. We highlighted the facts that Feaster's parents were both alcoholics and that his father was abusive. That we can spotlight those facts in one case to portray Feaster as having relatively low culpability, and virtually ignore them in Feaster's own case demonstrates the hopelessly unstructured and unreliable nature of our precedent-seeking review.

## 2. Comparative Culpability

Only eighteen of the thirty-three cases in Feaster's F–2 subcategory proceeded to the penalty phase. In those eighteen penalty trials, the jury sentenced three people other than Feaster to death: Morton (affirmed today), Hightower (two death sentences vacated), and Long (death sentence overturned, entered guilty plea to non-capital murder). Our duty in this portion of proportionality review is "to ensure that the defendant has not been 'singled out unfairly for capital punishment.'" *Cooper II, supra,* 159 *N.J.* at 88, 731 *A.*2d 1000 (quoting *Martini II, supra,* 139 *N.J.* at 47, 651 *A.*2d 949); *accord Chew II, supra,* 159 *N.J.* at 210, 731 *A.*2d 1070. For the purpose of precedent-seeking review, therefore, we determine whether the comparison life-sentenced cases render Feaster's death sentence disproportionate. It is important to note that that process is not a justifying one. It does not, in any way, attempt to deflect from the notion of murder as evil or imply that the death of the victim is anything other than horrific. Its focus is only to place a defendant's terrible crime on a continuum of other terrible crimes.

That said, Feaster's case is notable for its relatively low victimization. The only aggravating factor in Feaster's case was that the murder was committed in the course of a robbery, and that

factor is present in every F–2 case. Thus, it does not, in any way, distinguish Feaster as more culpable than any other F–2 defendant. Feaster is somewhat unusual, however, in that he fired a single shot and did not cause prolonged suffering to either the victim or any non-decedent victims. Donaghy died instantly, and there is no evidence that he was ever threatened, forced to take any action at gunpoint, or injured in any way other than the shooting itself. Again, to distinguish Feaster on the basis of relatively low aggravation is not meant to diminish the horrible impact of the crime on the victim, but to place Feaster on a scale of culpability relative to other murderers.

The Court acknowledges that four life-sentenced cases are sufficiently similar to Feaster's to raise serious questions about the proportionality of Feaster's sentence. *Ante* at 410–12, 757 A.2d at 278–79. I agree. The life sentences for Larry Jones, Rafael Slaughter, Aaron Stamps and Charles Williams are, as the Court states, "more difficult" to reconcile with Feaster's death sentence. *Ante* at 411, 757 A.2d at 279.

The Court also recognizes that Abdel Jaber Saleh's life sentence "cannot readily be reconciled with [Feaster's] death sentence." *Ibid.* That is an understatement. The degree of victimization caused by Abdel Jaber Saleh is among the most serious in the F–2 subcategory. Saleh strangled his victim with a metal chain, bound and gagged him with duct tape and plastic ties, dragged his body across the floor, doused him with charcoal fluid, then set him on fire. The autopsy report indicated that the victim was still alive when Saleh set him on fire. In addition to the 4(g) aggravating factor, Saleh's jury found aggravating factor 4(f)—that Saleh committed the murder to escape detection or apprehension. Like Feaster, Saleh was only 22 at the time of the offense, had no significant criminal history, and was uncooperative with law enforcement officers. Unlike Feaster, however, Saleh presented no evidence of any mental disease or defect, childhood trauma, brain damage, or intoxication at the time of the offense. Still, Saleh was given a life sentence.

Jones, Williams, and Slaughter all harmed multiple victims—five, four, and three, respectively. Although the 4(b) aggravating factor was only found in Jones's case, all three cases involved a serious risk of death to innocent bystanders as well as the use of threats and violence against non-decedent victims. Neither Jones nor Slaughter presented mitigating evidence as compelling as Feaster's mitigating evidence. Williams's evidence of sexual abuse and history of emotional disturbance are unusually tragic, but his criminal history is much more extensive than Feaster's; Williams spent all but 93 days of his adult life incarcerated. Williams's culpability is heightened by the fact that one of his surviving victims sustained serious brain damage while another was left disabled.

Stamps's case resembles Feaster's quite closely. Stamps, who shot a security guard twice in the chest during a bank robbery, acted with co-defendants and did not cooperate with the authorities. Like Feaster, Stamps grew up in an unstable home, has a substance abuse problem, and has borderline intelligence. Stamps, however, had three prior armed robbery convictions. The major differences between the two cases—Feaster's minimal criminal history, organic brain damage, and abuse at the hands of his alcoholic father—underscore Feaster's relatively lower culpability. Viewed side by side with those five life sentences that are either more aggravated, less mitigated, or both, Feaster's death sentence stands out as an anomaly.

The Court curiously finds five other F–2 penalty phase cases that resulted in life sentences "readily" distinguishable from Feaster's case, despite their close similarity. *Ante* at 408, 757 *A*.2d at 277. In distinguishing the life sentences given to John Downie, Craig Hart, Roger Hoyte, Joseph Wilson, and David Russo, the Court states that, unlike Feaster, those cases contain evidence of, (1) extreme mental or emotional disturbance, (2) youth, (3) diminished capacity at the time of the offense, and (4) lack of a significant criminal history. *Ante* at 409, 757 *A*.2d at 278. Those distinctions cannot be reconciled with, (1) Feaster's uncon-

troverted evidence of organic brain damage and psychological problems; (2) Feaster's youth (he was as young as or younger than Downie, Hart, Russo, and Hoyte at the time of the offense, and only a few years older than Wilson); (3) Feaster's alcohol and cocaine intoxication on the night of the offense; and (4) his minimal prior record consisting of a single, unindictable conviction.

The Court's conclusions are also difficult to reconcile with our opinion in *Loftin II*, in which we found Feaster to be relatively less culpable than similar cases specifically because of evidence that he suffered from a mental disease or defect and that his crime was mitigated by his youth and immaturity. 157 *N.J.* at 340–41, 724 *A.*2d 129. In comparing Feaster to Downie, Hart, Hoyte, Wilson, and Russo, *ante* at 408–10, 424–25, 757 *A.*2d at 277–78, 286–87, the Court also ignores Feaster's evidence of chronic child abuse that we found "compelling" in *Loftin II*. 157 *N.J.* at 340, 724 *A.*2d 129. None of the comparison defendants suffered from the same pattern of abuse that Feaster did. Only Downie and Hoyte offered comparable evidence of unstable, violent, and dysfunctional childhood environments, but the offenses committed by Downie (shooting at a police officer as well as murdering a gas station attendant) and Hoyte (shooting and stabbing three taxicab drivers) are much more aggravated than Feaster's.

Regarding the failure of the jury to find the 5(c)(age) and 5(d) (mental disorder or intoxication) mitigating factors in Feaster's case that were found for Downie, Hart and Wilson, "we are free to go beyond a jury's conclusion in respect of a mitigating factor." *Martini II, supra,* 139 *N.J.* at 3, 651 *A.*2d 949. Although we cannot say that the jury's findings regarding those factors are wrong, they are inexplicable in comparison to other penalty phase cases. Why would a jury, and the Court, find age a mitigating factor for Hart (age 25), Downie (age 24), and Hoyte (age 22), but not Feaster (age 22)? *Ante* at 409, 757 *A.*2d at 278. In any case, Feaster's relative youth and immaturity should be considered in

the case comparisons. The same logic applies to the 5(d) mitigating factor for intoxication. Although Feaster's jury did not find the 5(d) factor, the uncontroverted evidence was that he had consumed alcohol and cocaine on the night of the offense and that lowers his relative culpability in precedent-seeking review.

In comparison with Hoyte and Downie, Feaster's case is not particularly aggravated. To be sure, Feaster did not cooperate with authorities as Hoyte did. On the other hand, Hoyte's cooperation was fueled by the opportunity he had to plead to a non-capital offense in return for testimony against accomplices. Thus, it is not revelatory, in any meaningful way, of better character. Moreover, because Downie and Hoyte shared other similar characteristics with Feaster, such as a lack of a significant criminal record, youth, and intoxication during the offense, there is no logical explanation for the discrepancy in sentencing.

Russo's mitigating evidence (a minor criminal record, a history of substance abuse, no serious psychiatric history, a diagnosis of personality disorders, and evidence that he succeeded in controlled environments such as employment) is also similar to Feaster's, but his shooting of three gas station attendants is more aggravated than Feaster's offense. In comparison with Russo's life sentence, Feaster's death sentence is aberrant.

Hart and Wilson are theoretically distinguishable from Feaster because there was a jury finding of the 5(c) mitigating factor for age and 5(d) mitigating factor for mental disease or defect or intoxication in each case. However, that distinction does not hold water. Feaster's age and intoxication at the time of the offense should be considered in precedent-seeking review despite the absence of a jury finding. In reality, Feaster's evidence of youth, immaturity, and intoxication was similar to Hart's and Wilson's. What is truly different about Hart and Wilson is that those defendants both threatened victims at gunpoint and Wilson's victim suffered a protracted death. Neither Hart nor Wilson grew up in the kind of violent and unstable home that Feaster did,

and neither was affected by the brain damage that impaired Feaster's mental functioning. Viewing the cases in their entirety, Hart and Wilson are more culpable than Feaster and this their life sentences raise serious questions about the proportionality of Feaster's death sentence.

Other comparison cases that did not proceed to a penalty trial, either because the defendant pled to a non-capital offense or was not capitally prosecuted, provide further support for the disproportionality of Feaster's death sentence. Four such cases involve serious injuries to non-decedent victims in addition to a homicide victim. Corey Washington shot an elderly store clerk in the head; Emmanuel Charles shot a restaurant manager three times; Harold Rodriguez shot a gas station owner six times; and Jose Soto shot a restaurant owner after his wife told Soto there was no money to steal. Except for Rodriguez, who is married with three children and suffers from AIDS, not one of those cases contains mitigating circumstances as significant as Feaster's. None suffered from child abuse, organic brain damage, severe depression, or the constraints of borderline intelligence. Rodriguez was much older than Feaster when he committed his offense, and Soto, Charles, and Washington were only a few years younger. Like Feaster, all have minimal prior records except for Charles, who has an extensive juvenile record including numerous thefts and assaults. It is true that we do not know as much about the mitigating circumstances of those defendants because they all pled to non-capital offenses (Washington and Rodriguez to murder; Charles to felony murder; Soto to aggravated manslaughter). However, unlike Feaster, those defendants have also benefitted from the AOC's coding procedures, under which Feaster would have been coded with the 5(d) and 5(f) mitigating factors. *See* Administrative Office of the Courts, *Instructions for Screening Cases: Mens Rea, Own Conduct and Factors* (Feb. 5, 1999) (directing 5(d) to be coded where record indicates serious head injury, brain damage or drug addiction, and 5(f) to be coded where defendant has no convictions for an indictable offense and less than four disorderly persons convictions).

Timothy Harris presents yet another stark example of how anomalous Feaster's sentence is. Harris, acting alone, followed two people into a store, robbed them at gunpoint, and shot one victim in the head because she did not hand over all her money. The victim survived for hours in the emergency room before dying as a result of the gunshot wound. The only mitigating evidence in the record about Harris is that he was nineteen at the time of the offense, and that that was his first indictable offense as an adult. Accordingly, the AOC coded the 5(c) and 5(f) mitigating factors present. However, Harris had essentially led a life of crime as reflected in thirty-one juvenile complaints beginning when he was thirteen, for a variety of offenses including robbery, assault, and weapons offenses.

Of the twenty-three comparison cases to Feaster, at least sixteen can be easily classified as more culpable than Feaster. Their offenses were either more aggravated, presented fewer mitigating circumstances, or both, yet resulted in a life sentence.

To me, this entire exercise underscores the randomness of the death sentence process and reveals that Feaster's death sentence is disproportionate because it cannot be reconciled on a consistent, reasoned basis with the majority of life sentences imposed on similarly situated defendants.

Accordingly, I dissent.

*For affirmance*—Chief Justice PORITZ and Justices O'HERN, STEIN, COLEMAN, and LaVECCHIA—5.

*For vacating and remandment*—Justice LONG—1.